# BOWEN, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL. *v.* ROY ET AL.

No. 84-780.   Argued January 14, 1986—Decided June 11, 1986

BURGER, C. J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which BRENNAN, MARSHALL, BLACKMUN, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, and an opinion with respect to Part III, in which POWELL and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion concurring in part, *post*, p. 712. STEVENS, J., filed an opinion concurring in part and concurring in the result, *post*, p. 716. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 724. WHITE, J., filed a dissenting opinion, *post*, p. 733.

*Deputy Solicitor General Geller* argued the cause for appellants. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Willard, Kathryn A. Oberly,* and *Peter R. Maier.*

*Gary S. Gildin* argued the cause for appellees. With him on the brief were *Franklin A. Miles, Jr., Stefan Presser,* and *Charles S. Sims.**

*Briefs of *amici curiae* urging affirmance were filed for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell;* for the National Congress of American Indians et al. by *Steven C. Moore;* and for the Rutherford Institute et al. by *W. Charles Bundren, Guy O. Farley, Jr., John W. Whitehead, James J. Knicely, Thomas O. Kotouc, Wendell R. Bird,* and *William B. Hollberg.*

CHIEF JUSTICE BURGER announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, and an opinion with respect to Part III, in which JUSTICE POWELL and JUSTICE REHNQUIST join.

The question presented is whether the Free Exercise Clause of the First Amendment compels the Government to accommodate a religiously based objection to the statutory requirements that a Social Security number be provided by an applicant seeking to receive certain welfare benefits and that the States use these numbers in administering the benefit programs.

I

Appellees Stephen J. Roy and Karen Miller applied for and received benefits under the Aid to Families with Dependent Children program and the Food Stamp program. They refused to comply, however, with the requirement, contained in 42 U. S. C. § 602(a)(25)[1] and 7 U. S. C. § 2025(e), that participants in these programs furnish their state welfare agencies with the Social Security numbers of the members of their household as a condition of receiving benefits. Appellees contended that obtaining a Social Security number for their 2-year-old daughter, Little Bird of the Snow, would violate their Native American religious beliefs. The Pennsylvania Department of Public Welfare thereafter terminated AFDC and medical benefits payable to appellees on the child's behalf and instituted proceedings to reduce the level of food stamps that appellees' household was receiving. Appellees then filed this action against the Secretary of the Pennsylvania Department of Public Welfare, the Secretary of Health and Human Services, and the Secretary of Agriculture, arguing that the Free Exercise Clause entitled them to an exemption from the Social Security number requirement. In their com-

---

[1] We refer to the statutory scheme as it existed at the time appellees filed suit. The scheme has since been amended, although the Social Security number requirement has been retained in virtually identical form. See Deficit Reduction Act of 1984, Pub. L. 98–369, § 2651(a), 98 Stat. 1147.

plaint, appellees stated that "[t]he sole basis" for the denial of welfare benefits was "Mr. Roy's refusal to obtain a Social Security Number for Little Bird of the Snow," and thus requested injunctive relief, damages, and benefits. In the statement of "undisputed facts," the parties agreed that Little Bird of the Snow did not have a Social Security number.

At trial, Roy testified that he had recently developed a religious objection to obtaining a Social Security number for Little Bird of the Snow.[2] Roy is a Native American descended from the Abenaki Tribe, and he asserts a religious belief that control over one's life is essential to spiritual purity and indispensable to "becoming a holy person." Based on recent conversations with an Abenaki chief, Roy believes that technology is "robbing the spirit of man." In order to prepare his daughter for greater spiritual power, therefore, Roy testified to his belief that he must keep her person and spirit unique and that the uniqueness of the Social Security number as an identifier, coupled with the other uses of the number over which she has no control, will serve to "rob the spirit" of his daughter and prevent her from attaining greater spiritual power.

For purposes of determining the breadth of Roy's religious concerns, the trial judge raised the possibility of using the phonetics of his daughter's name to derive a Social Security number. Although Roy saw "a lot of good" in this suggestion, he stated it would violate his religious beliefs because the special number still would apply uniquely and identify her. Roy also testified that his religious objection would not be satisfied even if the Social Security Administration appended the daughter's full tribal name to her Social Security number.

---

[2] Roy and Miller both have Social Security numbers. They also obtained a Social Security number for their 5-year-old daughter Renee at some time prior to the present dispute.

In Roy's own testimony, he emphasized the evil that would flow simply from *obtaining* a number.[3]   On the last day of trial, however, a federal officer inquired whether Little Bird of the Snow already had a Social Security number; he learned that a number had been assigned—under first name "Little," middle name "Bird of the Snow," and last name "Roy."

The Government at this point suggested that the case had become moot because, under Roy's beliefs, Little Bird of the Snow's spirit had already been "robbed."   Roy, however, was recalled to the stand and testified that her spirit would be robbed only by "use" of the number.   Since no known use of the number had yet been made, Roy expressed his belief that her spirit had not been damaged.   The District Court concluded that the case was not moot because of Roy's beliefs regarding "use" of the number.   See *Roy* v. *Cohen*, 590 F. Supp. 600, 605 (MD Pa. 1984) (finding of fact 33) ("Roy believes that the establishment of a social security number for Little Bird of the Snow, without more, has not 'robbed her spirit,' but widespread use of the social security number by the federal or state governments in their computer systems would have that effect").

After hearing all of the testimony, the District Court denied appellees' request for damages and benefits, but granted injunctive relief.   Based on the testimony of the Government's experts and the obvious fact that many people share certain names, the District Court found that "[u]tilization in

---

[3] "[Q.] Mr. Roy, could you explain why obtaining a Social Security Number for Little Bird of the Snow would be contrary to your religious beliefs as a native Abenaki?

"A. Yes.   Because we felt that this number would be used to rob her of her ability to have greater power in that this number is a unique number. It serves unique purposes.   It's applied to her and only her; and being applied to her, that's what offends us, and we try to keep her person unique, and we try to keep her spirit unique, and we're scared that if we were to use this number, she would lose control of that and she would have no ability to protect herself from any evil that that number might be used against her."   App. 85.

the computer system of the name of a benefit recipient alone frequently is not sufficient to ensure the proper payment of benefits." The court nevertheless concluded that the public "interest in maintaining an efficient and fraud resistant system can be met without requiring use of a social security number for Little Bird of the Snow," elaborating:

> "It appears to the Court that the harm that the Government might suffer if [appellees] prevailed in this case would be, at worst, that one or perhaps a few individuals could fraudulently obtain welfare benefits. Such a result would obtain only if (1) Little Bird of the Snow attempted fraudulently to obtain welfare benefits or someone else attempted fraudulently to obtain such benefits using Little Bird of the Snow's name *and* (2) identification procedures available to the Defendants that do not require utilization of a social security number failed to expose the fraud. This possibility appears to the Court to be remote." *Id.*, at 612–613.

Citing our decision in *United States* v. *Lee*, 455 U. S. 252 (1982), the court entered an injunction containing two basic components. *First*, the Secretary of Health and Human Services was "permanently restrained from making any use of the social security number which was issued in the name of Little Bird of the Snow Roy and from disseminating the number to any agency, individual, business entity, or any other third party." *Second*, the federal and state defendants were enjoined until Little Bird of the Snow's 16th birthday from denying Roy cash assistance, medical assistance, and food stamps "because of the [appellees'] refusal to provide a social security number for her."

We noted probable jurisdiction, 472 U. S. 1016 (1985), and we vacate and remand.

## II

Appellees raise a constitutional challenge to two features of the statutory scheme here.[4]   They object to Congress' requirement that a state AFDC plan *"must . . .* provide (A) that, *as a condition of eligibility* under the plan, *each* applicant for or recipient of aid *shall* furnish to the State agency his social security account number."   42 U. S. C. § 602(a)(25) (emphasis added).   They also object to Congress' requirement that "such State agency *shall utilize* such account numbers . . . in the administration of such plan."   *Ibid.* (emphasis added).[5]   We analyze each of these contentions, turning to the latter contention first.

Our cases have long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not absolute.   This case implicates only the latter concern.   Roy objects to the statutory requirement that state agencies "shall utilize" Social Security numbers not because it places any restriction on what he may believe or what he may do, but because he believes the use of the number may harm his daughter's spirit.

Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family.   The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.   Just as the Government may not insist that appellees engage in

---

[4] They also raise a statutory argument—that the Government's denial of benefits to them constitutes illegal discrimination on the basis of religion or national origin.   See 42 U. S. C. § 2000d; 7 U. S. C. § 2011.   We find these claims to be without merit.

[5] The Food Stamp program restrictions that appellees challenge contain restrictions virtually identical to those in the AFDC program quoted in the text.   See 7 U. S. C. § 2025(e).

any set form of religious observance, so appellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter. "[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." *Sherbert* v. *Verner*, 374 U. S. 398, 412 (1963) (Douglas, J., concurring).

As a result, Roy may no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets. The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.

As Roy points out, eight years ago Congress passed a Joint Resolution concerning American Indian religious freedom that provides guidance with respect to this case. As currently codified, the Resolution provides:

> "On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U. S. C. § 1996.

That Resolution—with its emphasis on protecting the freedom to believe, express, and exercise a religion—accurately identifies the mission of the Free Exercise Clause itself. The Federal Government's use of a Social Security number for Little Bird of the Snow does not itself in any degree impair Roy's "freedom to believe, express, and exercise" his re-

ligion.[6]   Consequently, appellees' objection to the statutory requirement that each state agency "shall utilize" a Social Security number in the administration of its plan is without merit.   It follows that their request for an injunction against use of the Social Security number in processing benefit applications should have been rejected.   We therefore hold that the portion of the District Court's injunction that permanently restrained the Secretary from making any use of the Social Security number that had been issued in the name of Little Bird of the Snow Roy must be vacated.

## III

Roy also challenges Congress' requirement that a state AFDC plan "*must . . .* provide (A) that, *as a condition of eligibility* under the plan, *each* applicant for or recipient of aid *shall furnish* to the State agency his social security account number."   42 U. S. C. § 602(a)(25) (emphasis added).[7]   The

---

[6] Roy's religious views may not accept this distinction between individual and governmental conduct.   See, *e. g.*, n. 3, *supra*.   It is clear, however, that the Free Exercise Clause, and the Constitution generally, recognize such a distinction; for the adjudication of a constitutional claim, the Constitution, rather than an individual's religion, must supply the frame of reference.

[7] This issue is clearly not moot in light of our discussion in Part II, contrary to the suggestion of the two concurrences.   JUSTICE STEVENS asserts that "there is nothing in the record to suggest that the Government will not pay the benefits in dispute as soon as the District Court's injunction against the use of the number has been vacated."   *Post*, at 723.   To my mind, this statement, while true, fundamentally misperceives the nature of appellees' suit.   Appellees do not seek to have the Government "pay the benefits in dispute as soon as the District Court's injunction against use of the number has been vacated."   Such payment would entail use of Little Bird of the Snow's Social Security number, use that appellees filed suit to prevent.

JUSTICE BLACKMUN similarly believes that on remand "it is possible that the Government, in a welcome display of reasonableness, will decide that since it already has a Social Security number for Little Bird of the Snow, it will not insist that appellees resupply it."   *Post*, at 714–715.   My reading of the record is that such an occurrence is not a mere "possibility."   JUS-

First Amendment's guarantee that "Congress shall make no law . . . prohibiting the free exercise" of religion holds an important place in our scheme of ordered liberty, but the Court has steadfastly maintained that claims of religious conviction do not automatically entitle a person to fix unilaterally the conditions and terms of dealings with the Government. Not all burdens on religion are unconstitutional. See *Reynolds* v. *United States*, 98 U. S. 145 (1879). This was treated recently in *United States* v. *Lee:*

> "To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good. Religious beliefs can be accommodated, but there is a point at which accommodation would 'radically restrict the operating latitude of the legislature.'" 455 U. S., at 259.

---

TICE STEVENS cites federal regulations that provide that the Government will assist households that, for some reason or other, are unable to furnish a Social Security number. See *post,* at 721–722. Moreover, the Government's brief in this Court reports that "we are advised by the Social Security Administration that *the agency itself assigns [Social Security numbers] to persons who are required by federal law to have one but decline to complete an application.* If, for religious reasons, the individual requiring [a Social Security number] does not wish to receive a social security card, the agency will accommodate that request. Similarly, when an applicant refuses to sign an application for [a Social Security number] on religious grounds, [Social Security Administration personnel] may sign in lieu of the applicant." Brief for Appellants 46, n. 19 (emphasis added; citations omitted). Thus, the Government undoubtedly would be happy to "supply" the number for appellees — *i. e.,* fill the number in on their applications — if this is what they wanted. But appellees do not desire any such assistance from the Government; instead they filed suit seeking a ruling excluding them from the operation of any portion of the statutory scheme involving Social Security numbers. They continue to press this claim in this Court. For the reasons advanced here this claim ultimately lacks merit, but it certainly is not moot.

Also, in view of our analysis of the case, because all relevant facts are before the Court and further proceedings in the District Court could not produce information that would change the result, the case is ripe for decision.

The statutory requirement that applicants provide a Social Security number is wholly neutral in religious terms and uniformly applicable. There is no claim that there is any attempt by Congress to discriminate invidiously or any covert suppression of particular religious beliefs. The administrative requirement does not create any danger of censorship[8] or place a direct condition or burden on the dissemination of religious views.[9] It does not intrude on the organization of a religious institution[10] or school.[11] It may indeed confront some applicants for benefits with choices, but in no sense does it affirmatively compel appellees, by threat of sanctions, to refrain from religiously motivated conduct[12] or to engage in conduct that they find objectionable for religious reasons.[13] Rather, it is appellees who seek benefits from the Government and who assert that, because of certain religious beliefs, they should be excused from compliance with a condition that is binding on all other persons who seek the same benefits from the Government.

This is far removed from the historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause of the First Amendment. See generally M. Malbin, Religion and Politics: The Intentions of the Authors of the First Amendment (1978). We are not unmindful of the importance of many government benefits today or of the value of sincerely held religious be-

---

[8] Cf. *Cantwell* v. *Connecticut*, 310 U. S. 296, 305 (1940).

[9] Cf. *Follett* v. *Town of McCormick*, 321 U. S. 573, 577–578 (1944); *Murdock* v. *Pennsylvania*, 319 U. S. 105, 112 (1943).

[10] Cf. *Kedroff* v. *St. Nicholas Cathedral*, 344 U. S. 94 (1952).

[11] Cf. *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490 (1979).

[12] Cf. *Prince* v. *Massachusetts*, 321 U. S. 158 (1944); *Cox* v. *New Hampshire*, 312 U. S. 569, 574 (1941); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Reynolds* v. *United States*, 98 U. S. 145, 167 (1879).

[13] *United States* v. *Lee*, 455 U. S. 252, 259 (1982); *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972); *Gillette* v. *United States* 401 U. S. 437 (1971); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943); *Jacobson* v. *Massachusetts*, 197 U. S. 11 (1905).

liefs. However, while we do not believe that no government compulsion is involved, we cannot ignore the reality that denial of such benefits by a uniformly applicable statute neutral on its face is of a wholly different, less intrusive nature than affirmative compulsion or prohibition, by threat of penal sanctions, for conduct that has religious implications.

This distinction is clearly revealed in the Court's opinions. Decisions rejecting religiously based challenges have often recited the fact that a mere denial of a governmental benefit by a uniformly applicable statute does not constitute infringement of religious liberty. In *Hamilton* v. *Regents of University of California*, 293 U. S. 245 (1934), for example, the Court rejected a religious challenge by students to military courses required as part of their curriculum, explaining:

> "The fact that they are able to pay their way in this university but not in any other institution in California is without significance upon any constitutional or other question here involved. California has not drafted or called them to attend the university. They are seeking education offered by the State and at the same time insisting that they be excluded from the prescribed course solely upon grounds of their religious beliefs and conscientious objections to war . . . ." *Id.*, at 262.[14]

In cases upholding First Amendment challenges, on the other hand, the Court has often relied on the showing that compulsion of certain activity with religious significance was in-

---

[14] Concurring in *McGowan* v. *Maryland*, 366 U. S. 420, 521 (1961), Justice Frankfurter viewed it as important that the challenged statutes "do not make criminal, do not place under the onus of civil or criminal disability, any act which is itself prescribed by the duties of the Jewish or other religions." In *Braunfeld* v. *Brown*, 366 U. S. 599, 605–606 (1961), the plurality opinion emphasized: "Fully recognizing that the alternatives open to appellants and others similarly situated . . . may result in some financial sacrifice in order to observe their religious beliefs, still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful."

volved. In *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), for example, the Court distinguished the earlier *Hamilton* holding and upheld a challenge to a flag salute requirement:

> "Here . . . we are dealing with a compulsion of students to declare a belief. . . . This issue is not prejudiced by the Court's previous holding that where a State, without compelling attendance, extends college facilities to pupils who voluntarily enroll, it may prescribe military training as part of the course without offense to the Constitution. It was held that those who take advantage of its opportunities may not on ground of conscience refuse compliance with such conditions. *Hamilton* v. *Regents*, 293 U. S. 245. In the present case attendance is not optional." 319 U. S., at 631–632.[15]

The distinction between governmental compulsion and conditions relating to governmental benefits contained in these two cases was emphasized by JUSTICE BRENNAN in his concurring opinion in *Abington School District* v. *Schempp*, 374 U. S. 203 (1963):

> "The different results of *[Hamilton* and *Barnette]* are attributable only in part to a difference in the strength of the particular state interests which the respective statutes were designed to serve. Far more significant is the fact that *Hamilton* dealt with the voluntary attendance at college of young adults, while *Barnette* involved the compelled attendance of young children at elementary and secondary schools. This distinction warrants a difference in constitutional results." *Id.*, at 252–253 (footnote omitted).

---

[15] In *Wisconsin* v. *Yoder, supra,* at 218, we similarly relied on the fact that "[t]he impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."

We have repeatedly emphasized this distinction: In rejecting a Free Exercise challenge in *Bob Jones University* v. *United States*, 461 U. S. 574, 603–604 (1983), for example, we observed that the "[d]enial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets." [16]

We conclude then that government regulation that indirectly and incidentally calls for a choice between securing a governmental benefit and adherence to religious beliefs is wholly different from governmental action or legislation that criminalizes religiously inspired activity or inescapably compels conduct that some find objectionable for religious reasons. Although the denial of government benefits over religious objection can raise serious Free Exercise problems, these two very different forms of government action are not governed by the same constitutional standard. A governmental burden on religious liberty is not insulated from review simply because it is indirect, *Thomas* v. *Review Board of Indiana Employment Security Div.*, 450 U. S. 707, 717–718 (1981) (citing *Sherbert* v. *Verner*, 374 U. S., at 404);

---

[16] JUSTICE O'CONNOR's partial dissent asserts that the Court's holding "has no basis in precedent," *post*, at 727. To the contrary, it is the history advanced by the dissenting opinions that is revisionist. The dissent characterizes our prior cases as holding that the denial of a benefit is the same, for constitutional purposes, as the imposition of a criminal sanction. In *Bob Jones University*, however, the Court upheld the denial of tax benefits to a school that prohibited interracial dating, observing that the school remained wholly free to "observ[e] [its] religious tenets." 461 U. S., at 604. If denying governmental benefits is the same as imposing criminal sanctions, then the Free Exercise Clause could not prevent the Government from ordering Bob Jones University, under pain of criminal penalty, to violate its religious beliefs and permit interracial dating on its campus. But that difficult question is still an open one since "the Constitution may compel toleration of private discrimination in some circumstances." *Norwood* v. *Harrison*, 413 U. S. 455, 463 (1973).

but the nature of the burden is relevant to the standard the government must meet to justify the burden.

The general governmental interests involved here buttress this conclusion. Governments today grant a broad range of benefits; inescapably at the same time the administration of complex programs requires certain conditions and restrictions. Although in some situations a mechanism for individual consideration will be created, a policy decision by a government that it wishes to treat all applicants alike and that it does not wish to become involved in case-by-case inquiries into the genuineness of each religious objection to such condition or restrictions is entitled to substantial deference. Moreover, legitimate interests are implicated in the need to avoid any appearance of favoring religious over nonreligious applicants.

The test applied in cases like *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972), is not appropriate in this setting. In the enforcement of a facially neutral and uniformly applicable requirement for the administration of welfare programs reaching many millions of people, the Government is entitled to wide latitude. The Government should not be put to the strict test applied by the District Court; that standard required the Government to justify enforcement of the use of Social Security number requirement as the least restrictive means of accomplishing a compelling state interest.[17] Absent proof of an intent to discriminate against particular religious beliefs or against religion in general, the Government

---

[17] It is readily apparent that virtually *every* action that the Government takes, no matter how innocuous it might appear, is potentially susceptible to a Free Exercise objection. For example, someone might raise a religious objection, based on Norse mythology, to filing a tax return on a Wednesday (Woden's day). Accordingly, if the dissent's interpretation of the Free Exercise Clause is to be taken seriously, then the Government will be unable to enforce any generally applicable rule unless it can satisfy a federal court that it has a "compelling government interest." While libertarians and anarchists will no doubt applaud this result, it is hard to imagine that this is what the Framers intended.

meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest.

We reject appellees' contention that *Sherbert* and *Thomas* compel affirmance. The statutory conditions at issue in those cases provided that a person was not eligible for unemployment compensation benefits if, "without good cause," he had quit work or refused available work. The "good cause" standard created a mechanism for individualized exemptions. If a state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent. Thus, as was urged in *Thomas*, to consider a religiously motivated resignation to be "without good cause" tends to exhibit hostility, not neutrality, towards religion. See Brief for Petitioner 15, and Brief for American Jewish Congress as *Amicus Curiae* 11, in *Thomas* v. *Review Board of Indiana Employment Security Div.*, O. T. 1979, No. 79–952. See also *Sherbert, supra*, at 401–402, n. 4; *United States* v. *Lee*, 455 U. S., at 264, n. 3 (STEVENS, J., concurring in judgment) (*Thomas* and *Sherbert* may be viewed "as a protection against unequal treatment rather than a grant of favored treatment for the members of the religious sect"). In those cases, therefore, it was appropriate to require the State to demonstrate a compelling reason for denying the requested exemption.

Here there is nothing whatever suggesting antagonism by Congress towards religion generally or towards any particular religious beliefs. The requirement that applicants provide a Social Security number is facially neutral and applies to all applicants for the benefits involved. Congress has made no provision for individual exemptions to the requirement in the two statutes in question. Indeed, to the contrary, Congress has specified that a state AFDC plan "*must . . .* provide (A) that, *as a condition of eligibility* under the plan, *each* applicant for or recipient of aid *shall* furnish to the

State agency his social security account number," 42 U. S. C. § 602(a)(25) (emphasis added), and that "[s]tate agencies *shall* (1) *require, as a condition of eligibility* for participation in the food stamp program, that *each* household member furnish to the State agency their social security account number," 7 U. S. C. § 2025(e) (emphasis added). Nor are these requirements relics from the past; Congress made the requirement mandatory for the Food Stamp program in 1981. Compare 7 U. S. C. § 2025(f) (1976 ed., Supp. IV) (State agencies "may" require that each household member furnish their Social Security number), with 7 U. S. C. § 2025(e) (States "shall" require that such numbers be furnished). Congress also recently extended to several other aid programs the mandatory requirement that the States use Social Security numbers in verifying eligibility for benefits. See Deficit Reduction Act of 1984, Pub. L. 98–369, § 2651(a), 98 Stat. 1147.

The Social Security number requirement clearly promotes a legitimate and important public interest. No one can doubt that preventing fraud in these benefits programs is an important goal. As Representative Richmond explained in support of the bill that made the Social Security number requirement mandatory for the Food Stamp program:

> "We know that however generously motivated Americans may be to furnish resources to the poor to enable them to survive, . . . they understandably object if they believe that those resources are being abused or wasted. . . .
>
> "We want to be certain that the food stamp program is run as efficiently and as error-free as possible.
>
> "We want applicants and recipients alike constantly to be aware that the Congress does not and will not tolerate any refusal to disclose earnings accurately, and underreporting of welfare or other assistance program benefits, any efforts to evade the work requirement or any other attempts to take advantage of the program and dollars intended only for those who completely satisfy the strin-

gent eligibility requirements set forth in sections 5 and 7 of the Food Stamp Act of 1977 and further tightened this year and in this bill." 127 Cong. Rec. 24783 (1981).

We also think it plain that the Social Security number requirement is a reasonable means of promoting that goal. The programs at issue are of truly staggering magnitude. Each year roughly 3.8 million families receive $7.8 billion through federally funded AFDC programs and 20 million persons receive $11 billion in food stamps. The Social Security program itself is the largest domestic governmental program in the United States today, distributing approximately $51 billion monthly to 36 million recipients. Because of the tremendous administrative problems associated with managing programs of this size, the District Court found:

"Social security numbers are used in making the determination that benefits in the programs are properly paid and that there is no duplication of benefits or failure of payment. . . . Utilization in the computer system of the name of a benefit recipient alone frequently is not sufficient to ensure the proper payment of benefits."

Social Security numbers are unique numerical identifiers and are used pervasively in these programs. The numbers are used, for example, to keep track of persons no longer entitled to receive food stamps because of past fraud or abuses of the program. Moreover, the existence of this unique numerical identifier creates opportunities for ferreting out fraudulent applications through computer "matching" techniques. One investigation, "Project Match," compared federal employee files against AFDC and Medicaid files to determine instances of Government employees receiving welfare benefits improperly. Data from 26 States were examined, and 9,000 individuals were identified as receiving duplicate welfare payments. While undoubtedly some fraud escapes detection in spite of such investigations, the President's Private Sector Survey on Cost Control, known more popularly as the "Grace Commis-

sion," recently reported that matching "is the Federal Government's most cost-effective tool for verification or investigation in the prevention and detection of fraud, waste and abuse." 7 The President's Private Sector Survey on Cost Control, Management Office Selected Issues — Information Gap in the Federal Government 90 (1984).

The importance of the Social Security number to these matching techniques is illustrated by the facts of this case. The District Court found that "efficient operation of these [matching] programs requires the use of computer systems that utilize unique numerical identifiers such as the social security number." 590 F. Supp., at 606. It further found that exempting even appellees alone from this requirement could result in "one or perhaps a few individuals . . . fraudulently obtain[ing] welfare benefits," *id.*, at 612, a prospect the court termed "remote." *Id.*, at 613. The District Court's assessment of this probability seems quite dubious.[18] But in any event, we know of no case obligating the Government to tolerate a slight risk of "one or perhaps a few individuals" fraudulently obtaining benefits in order to satisfy a religious objection to a requirement designed to combat that very risk. Appellees may not use the Free Exercise Clause to demand

---

[18] The District Court's assessment appears to have turned in part on its belief that it was unlikely that Little Bird of the Snow or her parents would attempt fraudulently to obtain welfare benefits. Without in any way questioning the conclusion that appellees are law-abiding citizens, we believe that the District Court misperceived the nature of the Government's interest. The Government's interest is ensuring a fraud-resistent system in the event that a fraudulent application *is made* by appellees.

This misunderstanding of the Government's interest probably accounts for the District Court's conclusion that the Government's interest in preventing fraud "can be satisfied without requiring a social security number for Little Bird of the Snow." 590 F. Supp., at 607. In any event, this conclusionary statement is certainly at odds with the District Court's more specific statement quoted in text regarding the prospects for "one or perhaps a few individuals . . . fraudulently obtain[ing] welfare benefits." Indeed, the partial dissent appears to concede that its position might result in one or perhaps a few individuals fraudulently receiving benefits.

Government benefits, but only on their own terms, particularly where that insistence works a demonstrable disadvantage to the Government in the administration of the programs.

As the Court has recognized before, given the diversity of beliefs in our pluralistic society and the necessity of providing governments with sufficient operating latitude, some incidental neutral restraints on the free exercise of religion are inescapable. As a matter of legislative policy, a legislature might decide to make religious accommodations to a general and neutral system of awarding benefits,[19] "[b]ut our concern is not with the wisdom of legislation but with its constitutional limitation." *Braunfeld* v. *Brown*, 366 U. S. 599, 608 (1961) (plurality opinion). We conclude that the Congress' refusal to grant appellees a special exemption does not violate the Free Exercise Clause.

The judgment of the District Court is vacated and the case is remanded.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part.

I join only Parts I and II of the opinion written by THE CHIEF JUSTICE.

In August 1983, appellees Stephen J. Roy and Karen Miller sued to prevent the Government from requiring them to provide a social security number for their 2-year-old daughter, Little Bird of the Snow, as a condition for obtaining food stamps and welfare benefits for the child. They object to the social security number requirement because of their sincere religious conviction that the Government's widespread use of a unique numerical identifier for their daughter will deprive her of spiritual power. After it developed at trial that the Government already had a social secu-

---

[19] An exemption adopted by Congress to accommodate religious beliefs such as appellees' would not violate the First Amendment's Establishment Clause. See *Sherbert* v. *Verner*, 374 U. S. 398, 409–410 (1963).

rity number for Little Bird of the Snow, the District Court enjoined the Government not only from denying benefits to her based on her parents' failure to provide a social security number, but also from using or disseminating the number already in the Government's possession until the child's 16th birthday. App. to Juris. Statement 25a.

I agree with the Court that the District Court erred in enjoining the Government's internal use of Little Bird of the Snow's social security number. It is easy to understand the rationale for that part of the District Court's injunction: appellees argue plausibly that the Government's threat to put the social security number into active use if they apply for benefits for their daughter requires them to choose between the child's physical sustenance and the dictates of their faith, the same dilemma created by the Government's initial requirement that appellees themselves supply a social security number for Little Bird of the Snow. Cf. *Sherbert* v. *Verner*, 374 U. S. 398, 404 (1963). They claim that, absent some compelling state interest, the Government should refrain from acting in ways that appellees believe on religious grounds will harm their daughter's spiritual development.

Although this argument has some facial appeal, I conclude, for the reasons stated in Part II of the Court's opinion, that it stretches the Free Exercise Clause too far. Consequently, I agree that the portion of the District Court's judgment that enjoins the Government from using or disseminating the social security number already assigned to Little Bird of the Snow must be vacated. I would also vacate the remainder of the judgment and remand the case for further proceedings, because once the injunction against use or dissemination is set aside, it is unclear on the record presently before us whether a justiciable controversy remains with respect to the rest of the relief ordered by the District Court. Roy and Miller evidently objected to the social security number requirement primarily because they did not want the *Govern-*

*ment* to be able to use a unique numerical identifier for Little Bird of the Snow, and that injury cannot be redressed if, as the Court today holds, the Government cannot be enjoined from using the pre-existing number. It is possible, however, that appellees still would have an independent religious objection to their being forced to cooperate actively with the Government by themselves providing their daughter's social security number on benefit applications. Cf. *United States* v. *Lee*, 455 U. S. 252, 257 (1982); *Thomas* v. *Review Board of Indiana Employment Security Div.*, 450 U. S. 707, 711 (1981).

In my view, the record is ambiguous on this score. In rejecting the Government's argument that the existence of the number rendered the case moot, the District Court found that Roy "feels compelled by his religious belief to avoid any use of that number and, to that end, has refused to provide the number to the Defendants in order to receive welfare benefits for Little Bird of the Snow." *Roy* v. *Cohen*, 590 F. Supp. 600, 608 (MD Pa. 1984). It is unclear whether the "use" to which the District Court referred included use by Roy and Miller, or just the more extensive use of the number by the Government. And even if the court meant to refer only to use by the Government, it is not clear that appellees do not also have an independent religious objection to the requirement that *they* provide a social security number for their daughter.

On the other hand, even if appellees do have such an objection, vacating the District Court's injunction against governmental use or dissemination of the number may moot this case in other ways. Regardless of whether Roy and Miller are required to provide their daughter's social security number on applications for benefits, they may simply be unwilling to apply for benefits without an assurance that the application will not trigger the use of the number. Conversely, it is possible that the Government, in a welcome display of rea-

sonableness, will decide that since it already has a social security number for Little Bird of the Snow, it will not insist that appellees resupply it.[1]

Since the proceedings on remand might well render unnecessary any discussion of whether appellees constitutionally may be required to provide a social security number for Little Bird of the Snow in order to obtain Government assistance on her behalf, that question could be said not to be properly before us. I nonetheless address it, partly because the rest of the Court has seen fit to do so, and partly because I think it is not the kind of difficult constitutional question that we should refrain from deciding except when absolutely necessary. Indeed, for the reasons expressed by JUSTICE O'CONNOR, see *post*, at 726–732, I think the question requires nothing more than a straightforward application of

---

[1] Unfortunately, I cannot agree that such flexibility on the Government's part is assured either by the Government's earlier argument to the District Court that the case should be dismissed as moot, or by regulations providing special assistance to handicapped applicants and applicants who cannot read and write English. Cf. *ante*, at 701–702, n. 7 (opinion of BURGER, C. J.); *post*, at 720 (STEVENS, J., concurring in part and concurring in result). Before this Court, the Government concedes only that *"it would not be an unreasonable construction* of the statutes [at issue in this case] to conclude that they are satisfied by the government's ability to use [social security numbers] already in its possession, as is the case with Little Bird of the Snow, or by the government's ability to assign (and then use) [a number] for a person who refuses to apply for one." Brief for Appellants 46, n. 19 (emphasis added). What the Government does not say is that it in fact will adopt this construction, which it does not appear to have followed in the past. It is worth recalling that the Government's response to appellees' refusal to supply a social security number for their daughter was not to assign her a number unilaterally, or to offer to do so, but rather to cut off benefits for the child.

Given THE CHIEF JUSTICE's contrary view that the Government "undoubtedly" will not insist that appellees themselves provide a social security number for Little Bird of the Snow, see *ante*, at 702, n. 7, I am at a loss to understand why THE CHIEF JUSTICE believes there is still a live controversy.

*Sherbert, Thomas,* and *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972).[2]   If it proves necessary to reach the issue on remand, I agree with JUSTICE O'CONNOR that, on the facts as determined by the District Court, the Government may not deny assistance to Little Bird of the Snow solely because her parents' religious convictions prevent them from supplying the Government with a social security number for their daughter.

JUSTICE STEVENS, concurring in part and concurring in the result.

Members of the Abenaki Indian Tribe are unquestionably entitled to the same constitutional protection against governmental action "prohibiting the free exercise" of their religion as are the adherents of other faiths.[1]   Our respect for the sincerity of their religious beliefs does not, however, relieve us from the duty to identify the precise character of the two quite different claims that the parents of Little Bird of the Snow have advanced.   They claim, first, that they are entitled to an injunction preventing the Government from making any use of a Social Security number assigned to Little Bird of the Snow; and second, that they are entitled to receive a full allowance of food stamps and cash assistance for Little Bird of the Snow without providing a Social Security number for her.

As the Court holds in Part II of its opinion, which I join, the first claim must fail because the Free Exercise Clause

---

[2] I do not share JUSTICE STEVENS' narrow view of *Sherbert* and *Thomas.*   Compare *post,* at 722, n. 17, with *Goldman* v. *Weinberger,* 475 U. S. 503, 524 (1986) (BLACKMUN, J., dissenting).   Consequently, I have no occasion to consider separately, as he does, the "hypothetical questions," *post,* at 723, that would arise if the Government refused to grant religious objectors an exemption from the social security number requirement, while simultaneously offering comparable exemptions and special assistance to applicants who are prevented in other ways from completing the required application forms.   See *post,* at 720–722.

[1] The First Amendment provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

does not give an individual the right to dictate the Government's method of recordkeeping. The second claim, I submit, is either moot or not ripe for decision.

## I

In order to understand the precise nature and current posture of appellees' claims, it is necessary to emphasize an extremely unusual feature of this case. At the outset of the litigation, the parties assumed—indeed, they stipulated to—a critical fact that was discovered to be inaccurate on the last day of the trial. Although the parties believed that Little Bird of the Snow did not have a Social Security number, the District Court found, and the parties now agree, that she has had a Social Security number since birth. The contrary belief had been central to the parties' perception of the litigation, and to the requested relief. It is thus also central to the state of the record as we find it.

At the state agency administrative hearing on the threatened withdrawal of certain benefits, the issue had been framed as whether to affirm a decision "determining the appellant's daughter, Little Bird of the Snow, ineligible for public assistance and Medical Assistance because the appellant would not apply for a Social Security Number for her."[2] In their complaint, Little Bird's parents alleged that "[t]he sole basis" for the denial of welfare benefits was "Mr. Roy's refusal to obtain a Social Security Number for Little Bird of the Snow,"[3] and thus requested injunctive relief, damages, and benefits. In the statement of "undisputed facts," the parties stipulated that Little Bird of the Snow did not have a Social Security number.[4] In the District Court's opinion

[2] Department of Public Welfare Adjudication, Complaint, Ex. A, p. 2.

[3] Complaint ¶ 11.

[4] Statement of Undisputed Facts ¶ 6, App. 13 ("With the exception of Little Bird of the Snow, [the members of the Roy family] all have Social Security Numbers"); ¶ 20, App. 14 ("The sole basis for these actions [the reduction of AFDC and medical assistance] was Mr. Roy's refusal to obtain a Social Security Number for Little Bird of the Snow").

denying summary judgment, the court began its opinion by observing that Roy and Miller "have refused to obtain a Social Security number for their two-year-old daughter, Little Bird of the Snow, on the ground that doing so would be contrary to their Native Abenaki Indian religious beliefs."[5] At trial, Roy's counsel introduced his case by emphasizing that Little Bird of the Snow, unlike the other members of the family, did not have a Social Security number and thus had not been exposed to the evil that the number represents.[6] In Roy's own testimony, he emphasized the evil that would flow from *obtaining* a number.[7] On the last day of trial, however, in response to questions, a federal official inquired, during a court recess, whether Little Bird of the Snow already had a Social Security number and discovered that she had been assigned a Social Security number at birth.[8]

This discovery had a dramatic impact on the litigation, and on the judgment under review. Because there was no longer any apparent basis for the dispute, the Government

---

[5] App. to Juris. Statement 27a.

[6] See App. 52–53. ("Mr. Roy has a Social Security number, as does his eldest daughter, Renee; but, as Mr. Roy will explain, the number was obtained before he became aware of what he perceives as a potential for evil of these numbers; and he will tell you that once that number is provided the evil is done and continuing to do so has no further effect; but with respect to Little Bird of the Snow, he simply cannot do so").

[7] "[Q.] Mr. Roy, could you explain why obtaining a Social Security Number for Little Bird of the Snow would be contrary to your religious beliefs as a native Abenaki?

"A. Yes. Because we felt that this number would be used to rob her of her ability to have greater power in that this number is a unique number. It serves unique purposes. It's applied to her and only her; and being applied to her, that's what offends us, and we try to keep her person unique, and we try to keep her spirit unique, and we're scared that if we were to use this number, she would lose control of that and she would have no ability to protect herself from any evil that that number might be used against her." *Id.*, at 85.

[8] *Id.*, at 442–443.

suggested that the case had become moot.[9]   Roy, however, responded to the discovery by changing his request for relief and asking for a cancellation of the existing number.[10]

Concluding that the discovery did not moot the case,[11] the District Court denied the request for damages and benefits, but granted injunctive relief.   The injunction—the judgment that we are considering—contains two basic components. First, the Secretary of Health and Human Services is "permanently restrained from making any use of the social security number which was issued in the name of Little Bird of the Snow Roy and from disseminating the number to any agency, individual, business entity, or any other third party."[12]   Second, the federal and state defendants are enjoined until Little Bird of the Snow's 16th birthday from denying Roy cash assistance, medical assistance, and food stamps "because of the Plaintiffs' refusal to provide a social security number for her."[13]   Of course, if the injunction preventing the Secretary from making use of the already existing number had not been granted, there would have been no apparent impediment to providing the benefits that had previously been denied.

As the case comes to us, the first question to be decided is whether the District Court erred in effectively canceling the number that had already been issued for Little Bird of the Snow and that established the appellees' eligibility for the benefits in dispute.   The Court correctly holds that the Dis-

---

[9] See *id.*, at 514–515 (argument of Deputy Attorney General of Pennsylvania); *id.*, at 521 (argument of Attorney for United States Dept. of Justice); Record, Doc. No. 68, p. 2 (federal defendants' motion to dismiss).

[10] Record, Doc. No. 65, pp. 2–3.

[11] See *Roy* v. *Cohen*, 590 F. Supp. 600, 605 (MD Pa. 1984) (finding of fact 33) ("Roy believes that the establishment of a social security number for Little Bird of the Snow, without more, has not 'robbed her spirit,' but widespread use of the social security number by the federal or state governments in their computer systems would have that effect").

[12] App. to Juris. Statement 24a.

[13] *Id.*, at 25a.

trict Court did err and that "the portion of the District Court's injunction that permanently restrained the Secretary from making any use of the Social Security number that had been issued in the name of Little Bird of the Snow Roy must be vacated." *Ante*, at 701. Having so held, however, the Court should pause to consider whether any other constitutional issue need be addressed. For, as the Court demonstrates, an objection to the Government's use of a Social Security number, and a possible objection to "providing" the number when the Government already has it, pose very different constitutional problems.

## II

Once we vacate the injunction preventing the Government from making routine use of the number that has already been assigned to Little Bird of the Snow, there is nothing disclosed by the record to prevent the appellees from receiving the payments that are in dispute. Indeed, since the Government itself suggested to the District Court that the case had become moot as soon as it was learned that a Social Security number already existed, it is obvious that the Government perceives no difficulty in making the requested payments in the future. The only issue that prevented the case from becoming moot was the claim asserted by Roy that he was entitled to an injunction that effectively canceled the existing number. Since that issue has now been resolved, nothing remains of the case.

Neither Roy nor the Government has pointed to anything in the record suggesting that Roy will be under any further obligation to "provide" a Social Security number for Little Bird of the Snow. Even if one makes the unsupported assumption that Roy may object to filing certain forms in the future, there is a conspicuous lack of evidence and findings concerning the extent to which such requirements might impose a burden either on Roy, or on any other person who finds difficulty in providing information on pertinent forms.

The absence of this information in the record is significant. Current regulations suggest that assistance for such difficulties may well be available in the programs at issue,[14] particularly for those with mental, physical, and linguistic handicaps that prevent completion of the required forms,[15] or other required steps in the application process.[16]   To the extent that

---

[14] See, *e. g.*, 7 CFR § 273.2(c)(1) (1985) ("The household shall be advised that it . . . may file an incomplete application form as long as the form contains the applicant's name and address and is signed by a responsible member of the household or the household's authorized representative").

[15] See 7 CFR § 282.17(c)(3)(v) (1985) ("Households which require special assistance in order to apply for food stamps if that special assistance will not be available for completing the monthly reports.   Special assistance shall include authorized representatives to complete monthly reports, home visits or telephone reporting in lieu of the report form.   Such households may be comprised of blind, mentally or physically disabled persons, persons whose reading and writing skills are so limited that they cannot complete monthly reports on their own, or non-English speaking persons residing in project areas where the bilingual requirement of § 272.4(c) do not apply").

[16] See 7 CFR § 273.2(e)(2) (1985) ("The office interview shall be waived if requested by any household which is unable to appoint an authorized representative and which has no household members able to come to the food stamp office because they are 65 years of age or older, or are mentally or physically handicapped"); *ibid.* ("The State agency shall waive the office interview on a case-by-case basis for any household which is unable to appoint an authorized representative and which has no household members able to come to the food stamp office because of transportation difficulties or similar hardships which the State agency determines warrants a waiver of the office interview.   These hardship conditions include, but are not limited to: Illness, care of a household member, prolonged severe weather, or work hours which preclude in-office interview").

Indeed, the regulations suggest that there may be a limited exception to the Social Security number requirement itself.   See 7 CFR § 273.6 (b)(2) (1985) ("For those individuals required to provide an SSN who do not have one, the State agency shall act as follows. . . . If an individual applies through the State agency, the State agency shall complete the application for an SSN, Form SS–5"); 50 Fed. Reg. 10469 (1985) (proposed 7 CFR § 273.6(d)) ("In determining if good cause exists for failure to comply with the requirement to apply for or provide the State agency with an SSN, the

other food stamp and welfare applicants are, in fact, offered exceptions and special assistance in response to their inability to "provide" required information, it would seem that a religious inability should be given no less deference. For our recent free exercise cases suggest that religious claims should not be disadvantaged in relation to other claims.[17]

These considerations highlight the fact that, if this case is not moot, it surely is not ripe. The case, as litigated, simply bears no resemblance to the currently abstract question about what the Government may require if it seeks a Social Security number that it already has.

Consistent with our longstanding principles of constitutional adjudication, we should decide nothing more than is actually necessary to dispose of the precise dispute before the Court,[18] and nothing more than is fairly presented by the

---

State agency shall consider information from the household member, the Social Security Administration and the State agency . . . . Good cause does not include delays due to illness, lack of transportation or temporary absences, because SSA makes provisions for mail-in applications in lieu of applying in person. . . . If the household member(s) applying for an SSN has been unable to obtain the documents required by SSA, the State agency caseworker should make every effort to assist the individual(s) in obtaining these documents").

[17] In *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707 (1981), and *Sherbert* v. *Verner*, 374 U. S. 398 (1963), the granting of a religious exemption was necessary to prevent the treatment of religious claims less favorably than other claims. See *United States* v. *Lee*, 455 U. S. 252, 264, n. 3 (1982) (STEVENS, J., concurring in judgment) (In *Thomas* and *Sherbert*, "the treatment of the religious objection to the new job requirements as though it were tantamount to a physical impairment that made it impossible for the employee to continue to work under changed circumstances could be viewed as a protection against unequal treatment rather than a grant of favored treatment for the members of the religious sect").

[18] See *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 569 (1947) ("[C]onstitutional issues affecting legislation will not be determined . . . in broader terms than are required by the precise facts to which the ruling is to be applied"); *Coffman* v. *Breeze Corp.*, 323 U. S. 316, 324–325 (1945) ("[T]he Court will not pass upon the constitutionality of legislation . . . until

record and the factual findings.[19]   Because the District Court has not made findings about the extent to which other exceptions and assistance are available for those who cannot, or do not, "provide" required information, and because there is nothing in the record to suggest that the Government will not pay the benefits in dispute as soon as the District Court's injunction against the use of the number has been vacated, I concur in the judgment vacating the remainder of the injunction.   No matter how interesting, or how clear their answers may appear to be, however, I would not address the hypothetical questions debated by THE CHIEF JUSTICE and JUSTICE O'CONNOR because they are not properly presented by the record in this case.[20]

---

it is necessary to do so to preserve the rights of the parties"); *Liverpool, New York and Philadelphia S.S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39 (1885) (This Court "is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is applied").

[19] See *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 542, n. 5 (1986) ("We have frequently recognized the importance of the facts and the factfinding process in constitutional adjudication"); *Minnick* v. *California Dept. of Corrections,* 452 U. S. 105, 123 (1981) ("In this case our analysis of the question whether the federal constitutional issues may be affected by additional proceedings in the state courts . . . is . . . affected by ambiguities in the record"); *England* v. *Louisiana Board of Medical Examiners,* 375 U. S. 411, 416 (1964) ("How the facts are found will often dictate the decision of federal claims"); *Townsend* v. *Sain,* 372 U. S. 293, 312 (1963) ("It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues"); *Wiener* v. *United States,* 357 U. S. 349, 352 (1958) ("The versatility of circumstances often mocks a natural desire for definitiveness"); *Hammond* v. *Schappi Bus Line,* 275 U. S. 164, 171–172 (1927) ("Before any of the questions suggested, which are both novel and of far reaching importance, are passed upon by this Court, the facts essential to their decision should be definitely found by the lower courts upon adequate evidence").

[20] Curiously, in explaining why they discourse at length on constitutional questions, THE CHIEF JUSTICE and JUSTICE O'CONNOR appear to rely on

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

I join Parts I and II of THE CHIEF JUSTICE's opinion and I would vacate only a portion of the injunction issued by the District Court.

I

I believe that appellees cannot pursue their free exercise claim based solely on the actions of the Government with respect to the use of a Social Security number already in its possession, or with respect to any other identification number the Government may wish to assign and use in connection with its administration of its welfare assistance program. Accordingly, I join Parts I and II of THE CHIEF JUSTICE's opinion, and I would vacate that portion of the District Court's judgment that enjoins the Government from using or disseminating the Social Security number already assigned to Little Bird of the Snow.

In all, eight Members of the Court believe that the District Court's injunction was overbroad in preventing the Government from using information already in its possession. See *ante*, at 699–701 (opinion of BURGER, C. J., joined by POWELL and REHNQUIST, JJ.); *ante*, at 716–717 (STEVENS, J., concurring in part and concurring in the result); *ante*, at 713 (BLACKMUN, J., concurring in part); *supra* this page.

A logical next step on the facts of this case is to consider whether the case is moot. Only two Members of the Court

different factual assumptions. Compare *ante*, at 702, n. 7 (BURGER, C. J.) (The "Government undoubtedly would be happy to 'supply' the number for appellees—*i. e.*, fill the number in on their applications—if this is what they wanted"), with *post*, at 725 (O'CONNOR, J., concurring in part and dissenting in part) ("The Government still refuses to concede that it should now provide welfare benefits to Little Bird of the Snow, even though it now claims to possess Little Bird of the Snow's Social Security number"). It is, of course, an elementary principle of judicial restraint that uncertainty about the facts should prevent unnecessary constitutional disquisitions.

believe that the case is, or may be, moot. See *ante*, at 720–723 (STEVENS, J., concurring in part and concurring in result) (stating that the case is moot or not ripe); *ante*, at 714–716 (BLACKMUN, J., concurring in part) (District Court should consider whether the case is moot). I agree with THE CHIEF JUSTICE, *ante*, at 701–702, n. 7, that the case is not moot.

The District Court enjoined the Government not only from disseminating or using the Social Security number already in its possession, but "from denying Plaintiff Roy cash assistance and medical assistance benefits for Little Bird of the Snow for the Plaintiffs' failure to provide a social security number for her." App. to Juris. Statement 24a. Because of this portion of the District Court's injunction, we continue to have before us a live case or controversy. Mr. Roy sought in part an injunction that "restrai[ns the Government] from denying cash assistance and medical assistance to Little Bird of the Snow for failure to provide a Social Security Number." Record, Doc. No. 65, Proposed Orders Submitted by Plaintiff 1–2. The District Court granted that relief. App. to Juris. Statement 24a. The Government still refuses to concede that it should now provide welfare benefits to Little Bird of the Snow, even though it now claims to possess Little Bird of the Snow's Social Security number, and even though the Solicitor General has been "advised by the Social Security Administration that the agency itself assigns [Social Security numbers] to persons who are required by federal law to have one but decline to complete an application." Brief for Appellants 46, n. 19. Because the Government contests the District Court's decision that the Government may not deny welfare benefits to Little Bird of the Snow despite its acknowledgment of appellees' sincere religious objections, Mr. Roy may properly press his suit. Although the Government properly challenges part of the District Court's injunction as overbroad, it seeks to overturn the rest of the injunction only on the grounds that the District Court improperly applied the substantive standards of the First Amendment.

## II

Given that a majority of the Court believes that the Government may use and disseminate information already in its possession, and given that the case is not moot, there is probably less remaining in this case than meets the eye. The interest asserted by the Government before the District Court could be wholly served after accommodating appellees' sincere religious beliefs, and the interests remaining after vacating the overbroad portion of the injunction are certainly no more difficult to pursue.

The Government has identified its goal as preventing fraud and abuse in the welfare system, a goal that is both laudable and compelling. The District Court, however, soundly rejected the Government's assertion that provision of the Social Security number was necessary to prevent such fraud and abuse. Among the means for which the Social Security number is used to reduce such fraud is "cross-matching," in which various computerized lists are compared with the welfare rolls to detect unreported income, individuals claimed as part of more than one household, and other fraudulent practices. *Roy* v. *Cohen*, 590 F. Supp. 600, 606–607 (MD Pa. 1984). As now appears, the Government not only has the Social Security number it wants for Little Bird of the Snow, but it can also use it. But even under the erroneous assumption of the District Court that no such number was available for use, that court found as a fact that, while cross-matching is "more difficult" without Social Security numbers, "[t]he file on a particular benefit recipient can be identified and cross-matching performed, if the recipient's full name, date of birth, and parents' names are entered into the computerized systems." *Id.*, at 607. The District Court's generalized evaluation of the asserted indispensability of the Social Security number similarly undermines the Government's claim here:

> "*The government's interest* in preventing Little Bird of the Snow from fraudulently receiving welfare benefits *can be satisfied without requiring a social security num-*

*ber* for Little Bird of the Snow." *Ibid.* (emphasis added).

Faced with these facts, however, THE CHIEF JUSTICE not only believes appellees themselves must provide a Social Security number to the Government before receiving benefits, but he also finds it necessary to invoke a new standard to be applied to test the validity of Government regulations under the Free Exercise Clause. *Ante,* at 707–708. He would uphold any facially neutral and uniformly applicable governmental requirement if the Government shows its rule to be "a reasonable means of promoting a legitimate public interest." *Ante,* at 708. Such a test has no basis in precedent and relegates a serious First Amendment value to the barest level of minimal scrutiny that the Equal Protection Clause already provides. I would apply our long line of precedents to hold that the Government must accommodate a legitimate free exercise claim unless pursuing an especially important interest by narrowly tailored means.

This Court has stated:

> "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas* v. *Review Bd. of Indiana Employment Security Div.,* 450 U. S. 707, 717–718 (1981).

Indeed, THE CHIEF JUSTICE appears to acknowledge at least that the law at issue here involves governmental compulsion. See *ante,* at 704 ("[W]e do not believe that no government compulsion is involved"). The Free Exercise Clause is therefore clearly implicated in this case. See *Thomas* v. *Review Bd., supra,* at 717–718; *Sherbert* v. *Verner,* 374 U. S. 398, 403–406 (1963).

Once it has been shown that a governmental regulation burdens the free exercise of religion, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin* v. *Yoder,* 406 U. S. 205, 215 (1972). This Court has consistently asked the Government to demonstrate that unbending application of its regulation to the religious objector "is essential to accomplish an overriding governmental interest," *United States* v. *Lee,* 455 U. S. 252, 257–258 (1982), or represents "the least restrictive means of achieving some compelling state interest," *Thomas* v. *Review Bd., supra,* at 718. See also *Braunfeld* v. *Brown,* 366 U. S. 599, 607 (1961); *Sherbert* v. *Verner, supra,* at 406. Only an especially important governmental interest pursued by narrowly tailored means can justify exacting a sacrifice of First Amendment freedoms as the price for an equal share of the rights, benefits, and privileges enjoyed by other citizens.

Granting an exemption to Little Bird of the Snow, and to the handful of others who can be expected to make a similar religious objection to providing the Social Security number in conjunction with the receipt of welfare benefits, will not demonstrably diminish the Government's ability to combat welfare fraud. The District Court found that the governmental appellants had hardly shown that a significant number of other individuals were likely to make a claim similar to that at issue here:

> "There have been four reported cases involving challenges to the social security number requirement for welfare benefits based upon the contention that the number violates sincerely held religious beliefs of the welfare recipient." 590 F. Supp., at 607.

Cf. *United States* v. *Lee, supra* (refusing request for exemption from mandatory taxation); *Gillette* v. *United States,* 401 U. S. 437 (1971) (refusing request for exemption from involuntary military service). The danger that a religious exemption would invite or encourage fraudulent applications seek-

ing to avoid cross-matching performed with the use of Social Security numbers is remote on the facts as found by the District Court: few would-be lawbreakers would risk arousing suspicion by requesting an exemption granted only to a very few. And the sincerity of appellees' religious beliefs is here undisputed. There is therefore no reason to believe that our previous standard for determining whether the Government must accommodate a free exercise claim does not apply.

*Bob Jones University* v. *United States*, 461 U. S. 574 (1983), does not support THE CHIEF JUSTICE's analysis. The Court stated in that case:

> "The governmental interest at stake here is compelling. . . . [T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education— discrimination that prevailed, with official approval, for the first 165 years of this Nation's constitutional history. That governmental interest substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs. The interests asserted by petitioners cannot be accommodated with that compelling governmental interest, see *United States* v. *Lee, supra,* at 259–260; and no 'less restrictive means,' see *Thomas* v. *Review Board of Indiana Employment Security Div., supra,* at 718, are available to achieve the governmental interest." *Id.,* at 604 (footnotes omitted).

See also *id.,* at 603 ("'The state may justify a limitation on religious liberty by showing that it is *essential* to accomplish an *overriding* governmental interest'") (emphasis added) (quoting *United States* v. *Lee, supra,* at 257–258). It is clear that the Court in *Bob Jones University* did not adopt anything like the legitimate interest/rational means test propounded by THE CHIEF JUSTICE, but rather continued to require the Government to show pursuit of an especially important interest by narrowly tailored means. In addition,

the interest that the Court in *Bob Jones University* balanced against asserted religious interests was not merely a compelling governmental interest but a *constitutional* interest. Here, although prevention of welfare fraud is concededly a compelling interest, the Government asserts only administrative efficiency as its reason for refusing to exempt appellees from furnishing the Social Security number. The District Court found that assertion sorely wanting, and our conclusion that part of the resulting injunction was overbroad only makes the Government's assertion less plausible. Surely the fact that the Court was willing in *Bob Jones University* to give overriding weight to the Government's interest in eradicating the scourge of racial discrimination does not mean that the Court must also give overriding weight to the unanchored anxieties of the welfare bureaucracy.

*Hamilton* v. *Regents of University of California*, 293 U. S. 245 (1934), also fails to support THE CHIEF JUSTICE's construction of a new test. When the Court decided *Hamilton*, it had not yet applied, and did not in *Hamilton* apply, the Free Exercise Clause to actions of the States. Cf. *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940). The Court's discussion in *Hamilton* of the state university's decision to require military training is therefore limited to a generalized analysis under the Fourteenth Amendment of whether the State's policy deprived the would-be students of "life, liberty, or property." See 293 U. S., at 261–262. The Court concluded that no such deprivation was involved when the State "ha[d] not drafted or called [the individuals] to [war]." *Id.*, at 262.

This Court's opinions have never turned on so slender a reed as whether the challenged requirement is merely a "reasonable means of promoting a legitimate public interest." *Ante*, at 708 (opinion of BURGER, C. J.). THE CHIEF JUSTICE appears to believe that the added inconvenience to the State of administering a selective exemption overbalances any burden on individual religious exercise. But this Court

has held that administrative inconvenience is not alone sufficient to justify a burden on free exercise unless it creates problems of substantial magnitude. See *Sherbert* v. *Verner*, 374 U. S., at 408–409. And as Part II of THE CHIEF JUSTICE's opinion makes clear, there is essentially no administrative burden imposed on the Government in this case.

Appellants have rested their case on vague allegations of administrative inconvenience and harm to the public fisc that are wholly unsubstantiated by the record and the findings of the District Court. The Court simply cannot, consistent with its precedents, distinguish this case from the wide variety of factual situations in which the Free Exercise Clause indisputably imposes significant constraints upon government. Indeed, five Members of the Court agree that *Sherbert* and *Thomas,* in which the government was required to accommodate sincere religious beliefs, control the outcome of this case to the extent it is not moot. See *ante,* at 716 (BLACKMUN, J., concurring in part); *post,* at 733 (WHITE, J., dissenting); *supra,* at 728–730.

THE CHIEF JUSTICE's distinction between this case and the Court's previous decisions on free exercise claims—that here "it is appellees who seek benefits from the Government and who assert that . . . they should be excused from compliance with a condition that is binding on all other persons who seek the same benefits from the Government," *ante,* at 703—has been directly rejected. The fact that the underlying dispute involves an award of benefits rather than an exaction of penalties does not grant the Government license to apply a different version of the Constitution:

> "[Welfare] benefits are a matter of statutory entitlement for persons qualified to receive them. Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are 'a "privilege" and not a "right." ' *Shapiro* v. *Thompson,* 394 U. S. 618, 627 n. 6 (1969). Relevant constitu-

tional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, *Sherbert* v. *Verner*, 374 U. S. 398 (1963) . . . ." *Goldberg* v. *Kelly*, 397 U. S. 254, 262 (1970) (footnote omitted).

See also *Sherbert* v. *Verner*, *supra*, at 404 ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege"). The fact that appellees seek exemption from a precondition that the Government attaches to an award of benefits does not, therefore, generate a meaningful distinction between this case and one where appellees seek an exemption from the Government's imposition of penalties upon them. Even if the Founding Fathers did not live in a society with the "broad range of benefits" and "complex programs" that the Federal Government administers today, *ante*, at 707 (opinion of BURGER, C. J.), they constructed a society in which the Constitution placed express limits upon governmental actions limiting the freedoms of that society's members. The rise of the welfare state was not the fall of the Free Exercise Clause.

Our precedents have long required the Government to show that a compelling state interest is served by its refusal to grant a religious exemption. The Government here has clearly and easily met its burden of showing that the prevention of welfare fraud is a compelling governmental goal. If the Government could meet its compelling needs only by refusing to grant a religious exemption, and chose a narrowly tailored means to do so, then the Government would prevail. But the Government has failed to show that granting a religious exemption to those who legitimately object to providing a Social Security number will do any harm to its compelling interest in preventing welfare fraud.

I would merely vacate that portion of the injunction issued by the District Court that enjoins the Government from

using or disseminating the Social Security number already in its possession.

JUSTICE WHITE, dissenting.

Being of the view that *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707 (1981), and *Sherbert* v. *Verner*, 374 U. S. 398 (1963), control this case, I cannot join the Court's opinion and judgment.