SHUMAKER, Appellant,

v.

OHIO DEPARTMENT OF HUMAN SERVICES, Appellee.

[Cite as *Shumaker v. Ohio Dept. of Human Serv.* (1996), 117 Ohio App.3d 730.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 17594.

Decided Dec. 26, 1996.

*Betty D. Montgomery*, Attorney General, and *Christopher Carlson*, Assistant Attorney General, for appellee.

*Debra Shumaker, pro se.*

SLABY, Judge.

Appellant, Debra Shumaker, appeals from the judgment of the Summit County Court of Common Pleas affirming the administrative decision of the Ohio Department of Human Services ("DHS") which denied appellant continuing public benefits under the Aid to Dependent Children ("ADC") and food stamp programs. The trial court ruled, *inter alia*, that the First Amendment's Free Exercise of Religion Clause was not violated by the administrative regulations and policy which do not allow appellant, or any potential recipient, to strike certain words on the benefit reapplication, even if such alterations are motivated by a recipient's religious beliefs. We affirm.

On November 10, 1994, appellant, a current ADC and food stamp recipient, refused to comply with the administrative regulations during her annual reapplication interview. In particular, she failed to cooperate in the redetermination process by not acknowledging her rights and responsibilities in the final part of the form. For a claimant to continue receiving the desired public benefits, the rules demand cooperation in completing the uniform reapplication. The information required by the form is designed to assist the DHS to determine whether a current benefit recipient is still entitled to participate in government programs. The "rights and responsibilities" section is particularly important. It helps to assure the DHS that the information a recipient has provided is truthful. This portion of the reapplication has another necessary aspect: verification. Verification is the process of cross-checking the information provided by a recipient for

accuracy. In acknowledging the "rights and responsibilities," a recipient also gives permission to the DHS to obtain, as well as to third parties to release, otherwise confidential information. While appellant apparently furnished the information required by the form, she refused to sign the form without first making certain alterations in the "rights and responsibilities" part of the reapplication. Specifically, she crossed out the word "authorize" and the phrases "declare under penalty of perjury" and "under penalty of perjury" at the end of the process. As altered, the form read, in pertinent part:

"I ~~authorize~~ any person who furnishes me with health care or supplies to give the Ohio Department of Human Services any information related to the extent, duration, and scope of services provided to me under the Medicaid program. * * *

"By my signature below, I ~~declare under penalty of perjury~~ that the information on this application including citizenship and alien status is true and complete to the best of my knowledge. I understand that the law provides penalty of fine or imprisonment (or both) for anyone convicted of accepting assistance he or she is not eligible for. I state ~~under penalty of perjury~~ that all of the information in this application is true and complete to the best of my knowledge."

Appellant did not attempt to replace the deleted words with others that would be acceptable to her religious beliefs.

The DHS worker immediately informed her that such alterations were not permitted and that the deletions would place her benefits in jeopardy. Appellant protested, explaining that she is a Christian woman and that the words stricken would constitute "swearing," which is prohibited by the Bible. Nevertheless, without a completed application, the DHS could not make a determination as to appellant's continuing eligibility and, as a result, terminated her benefits.

After exhausting her administrative remedies, appellant appealed to the court of common pleas, which affirmed the DHS's denial of public benefits without a hearing. On further appeal from the trial court's judgment, she assigns eight errors. We have rearranged the alleged errors in order to facilitate our review.

### Fourth Assignment of Error

"The lower court's decision was unreasonable, arbitrary, capricious, unconstitutional, and otherwise contrary to law for the reason that the Appellant was entitled to be assisted with her reapplication for public benefits, and she was entitled to notice and a reasonable opportunity to be heard on her appeal before the administrative agency."

Appellant contends that there were procedural irregularities during the oral administrative hearing which did not comport with the fair hearing rules, and as a

result, her rights to procedural due process were violated, rendering the DHS's decision void. The record belies appellant's contentions.

■ It is settled law that an appellate court must presume that the order of an administrative tribunal is valid and arrived at in the proper manner. See, *e.g.*, *Wheeling Steel Corp. v. Evatt* (1944), 143 Ohio St. 71, 28 O.O. 21, 54 N.Ed.2d 132; *Ohio Motor Vehicle Dealers Bd. v. Cent. Cadillac Co.* (1984), 14 Ohio St.3d 64, 14 OBR 456, 471 N.E.2d 488. The hearing regulations, while granting an individual paramount procedural protection, see *Goldberg v. Kelly* (1970), 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, also provide for informality and allow individuals "the opportunity to present their case in their own way." Ohio Adm.Code 5101:6–6–02(B)(1). See, also, R.C. Chapter 119; R.C. 5101.35.

Appellant argues that during the state hearing, she was not allowed to advance her arguments without undue interference because of interruptions by the hearing officer. See Ohio Adm.Code 5101:6–6–02(B)(2). She also alleges that she was denied an opportunity to question and refute the testimony of the workers representing the DHS in accordance with Ohio Adm.Code 5101:6–6–02(B)(2)(d) and (e).

■ First, we cannot find that the hearing officer's interruptions constituted undue interference. In fact, the full review of the record reveals just the opposite and refutes appellant's claim that the hearing officer "did not work with her, but against her."[1] Next, there was no indication that she wanted to refute the testimony of the DHS representative who related the events of her reapplication interview. Besides, there was no need, as the facts concerning her alterations were not in dispute. More compelling, her brief in support of her appeal from the state hearing decision did not complain that she was in any way hindered in presenting her case. See *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629; *Zieverink v. Ackerman* (1981), 1 Ohio App.3d 10, 1 OBR 51, 437 N.E.2d 319.

In summary, the record demonstrates that the DHS complied with the hearing regulations. Accordingly, as the rules articulate the procedures which preserve an individual's due process guarantees during a public benefit determination, appellant received her constitutional due: notice and an opportunity to be heard.

---

1. At the hearing, there was some initial difficulty because appellant stated that her conscience would not allow to her either "swear" or "affirm" to tell the truth. The examiner had to ask her questions so that she could answer "yes" or "no," and eventually, he just let her speak in order to attempt to decipher the problem. Appellant was able to explain her reasons for striking the words and phrases and their importance to her since her religious conversion, and managed to interrupt the hearing officer a few times as well.

See Ohio Adm.Code 5101:6–1 *et seq.;* R.C. Chapter 119. Accord Section 205.10, Title 45, C.F.R.; Section 273.15, Title 7, C.F.R.

Moreover, the procedural challenges were not presented to the trial court. Appellant chose instead to appeal from the adverse administrative action, asserting generally that the decision of the DHS "is not in accordance with law and is not supported by reliable, probative and substantial evidence, and is an abuse of discretion." No further enlightenment was forthcoming. The court, after a thorough perusal of the entire record, reviewed the DHS's power as well as appellant's religious rights under the First Amendment.

It is a fundamental principle "that a party receiving an adverse judgment in the common pleas court may not expand [that party's] claims in the court of appeals to maximize the chances of reversal or remand." *Kramp v. Ohio State Racing Comm.* (1991), 81 Ohio App.3d 186, 191–192, 610 N.E.2d 1013, 1017, citing *Rosenberry v. Chumney* (1960), 171 Ohio St. 48, 50, 12 O.O.2d 56, 57, 168 N.E.2d 285, 287. We decline to consider errors "which could have been brought to the trial court's attention and hence avoided or otherwise corrected." *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 210, 24 O.O.3d 316, 317–318, 436 N.E.2d 1001, 1003. The fourth assignment of error is overruled.

### Third Assignment of Error

"The lower court's decision was unreasonable, arbitrary, capricious, unconstitutional, and otherwise contrary to law for the reason that it is based on material findings of law and fact which are unsupported by the record."

Appellant argues that the administrative record failed to address the alteration issue and that it was, therefore, improper for the trial court to consider it. She also complains that the DHS's interpretation of its own administrative rules, as well as the application of those rules, was erroneous and that the regulation pertaining to cooperation was inconsistent with the governing statute. Appellant's arguments lack merit.

As to the authority of a court of common pleas upon review of an administrative order, R.C. 119.12 provides:

"The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record * * * that the order is supported by reliable, probative, and substantial evidence and is in accordance with law."

This means that the evidence must not only exist, but be in the record in order to support an affirmance. *Doelker v. Ohio Accountancy Bd.* (1967), 12 Ohio St.2d 76, 41 O.O.2d 328, 232 N.E.2d 407.

The record clearly demonstrates that appellant's religious concerns with the words on the reapplication were considered, and ultimately rejected, by the DHS. The essential facts are uncontroverted. At her initial interview, a worker confided to appellant that she, too, was a deeply religious person, but informed her that, regardless, every recipient must sign the form without alteration. The subsequent notice of termination of appellant's public benefits related the facts as follows:

"The Income Maintenance Worker stated that she explained to the appellant that she was not allowed to alter the wording on the application but that she had to sign the application in the form it was given to her. The appellant stated that Jesus did not wish for her to use certain words. She stated she would object to such words as authorize and sworn therefore she wanted to delete these words * * * [on] the application."

The DHS concluded that she had refused to cooperate in failing to complete the form. In addition, the state hearing officer, after an oral hearing on the record in which the DHS representatives and appellant testified, ruled: "A valid application was never submitted to the agency. Eligibility for assistance could not be determined." Therefore, the hearing officer reasoned that the denial of benefits was proper because appellant "failed to cooperate" by not signing and dating the form without alteration. During the hearing, the hearing officer had informed appellant: "You can't change a preposition. This is a legal document." When appellant continued to protest, the hearing officer attempted to explain:

"HO: But you can't .. you can't cross them out because you are giving them authority ... There is often times when we have to go and check things without ... (interrupted)

"DS: But I'm still giving them the permission to do that.

"HO: No you're not when you cross this out."

Furthermore, the administrative appeal decision, the final order of the DHS, also found that she did not cooperate. In that decision, the DHS stated, *inter alia*, that her deletion of the words constituted a refusal to cooperate in the verification process. Specifically, the decision explained, in pertinent part:

"Appellant testified that signing an application 'authorizing' the agency to obtain verification is contrary to her religious beliefs. Verification is an important part of the eligibility process. The CDHS must obtain written consent to obtain verification in accordance with OAC 5101:1–2–20 and the [recipient] is required to cooperate in the verification process and benefits may be terminated when the [recipient] fails to do so. Per 5101:1–2–20, it is also the [recipient's] responsibility to ensure that an application form is completed promptly, accurate-

ly and fully. Benefits must be terminated when the [recipient] refuses to be cooperative in the redetermination process. 5101:1–2–26."

In light of the foregoing, the trial court's consideration of the DHS's policy and determination that appellant, like any other benefit recipient, could not change the wording on the reapplication form was appropriate, as it was clearly a part of the administrative record.

Appellant also maintains that, even assuming the trial court could consider the DHS's "no alteration" policy, that policy is not the correct construction of the relevant regulations, its application to appellant's religious situation was not rational, and the particular rule which delineates the consequences of a recipient's uncooperativeness is in conflict with the statutory mandate because it does not provide factors to help the DHS workers exercise their discretion. We disagree.

▆▆▆ Judicial review of an agency's legal rulings, such as statutory interpretation, is relatively independent, see, *e.g., Ohio Historical Soc. v. State Emp. Relations Bd.* (1993), 66 Ohio St.3d 466, 471, 613 N.E.2d 591, 595–596; *Wise v. Ohio Motor Vehicle Dealers Bd.* (1995), 106 Ohio App.3d 562, 666 N.E.2d 625, and a reviewing court must affirm if such rules are reasonable in relation to the statute. See, *e.g., Parfitt v. Correctional Facility* (1980), 62 Ohio St.2d 434, 436, 16 O.O.3d 455, 456–457, 406 N.E.2d 528, 530; *Wise, supra.* An agency's interpretation of its own regulations is accorded due deference, see *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621–622, 614 N.E.2d 748, 750–751; *Jones Metal Products Co. v. Walker* (1972), 29 Ohio St.2d 173, 182, 58 O.O.2d 393, 398, 281 N.E.2d 1, 8–9, becoming controlling unless the construction is "plainly erroneous or inconsistent with the regulation." *United States v. Larionoff* (1977), 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48, 56. Accord *Pons, supra; Clark v. Ohio Dept. of Mental Retardation & Dev. Disabilities* (1988), 55 Ohio App.3d 40, 42, 562 N.E.2d 497, 499–500. An agency's application of its delegated power will be upheld so long as the agency has not abused its discretion. See, *e.g., Pons; State v. Schreckengost* (1972), 30 Ohio St.2d 30, 59 O.O.2d 60, 282 N.E.2d 50.

The General Assembly has provided for the public welfare through legislation creating a variety of public assistance programs, including ADC and Food Stamps. The ADC legislation, found in R.C. Chapter 5107, was originally enacted during this country's Great Depression to bring Ohio's program for aid and services for those families and children with inadequate resources into conformity with the requirements of federal law. See Section 601 *et seq.*, Title 42, U.S.Code (Social Security Act). Ohio's food stamp program, Ohio Adm.Code 5101:4–1 *et seq.*, likewise complies with the federal statute and regulations. See Section 2011, Title 7, U.S.Code (Food Stamp Act).

The DHS, as the designated administrative guardian, has been delegated the daunting task of providing necessary assistance to those truly deserving of help, while also protecting valuable tax dollars against fraudulent assertions of need. See R.C. 121.02(I) and 5101.01; R.C. 5101.54. In discharging its enforcement responsibilities, the legislative charter dictates that it must promulgate the rules and regulations to advance the "efficient operation" of these important, but conflicting, public goals. See R.C. 5107.02(A)(5); R.C. 5101.54(A)(8). See, also, Ohio Adm.Code 5101:1–1 *et seq.;* Ohio Adm.Code 5101:4–1 *et seq.*

The comprehensive statutory framework also specifically requires the DHS to prescribe the forms for the application or reapplication process, or otherwise to ensure the correctness of verification. R.C. 5107.02(A)(2); R.C. 5101.54(A)(2) and (5). As an additional facet of this enormous and complex task, R.C. 5107.05 proscribes that such reapplication ."shall contain the information as the department of human services may require" and instructs that after an application is received, an investigation must be undertaken to determine eligibility. See, also, Ohio Adm.Code 5101:1–2–20(C). Accord R.C. 5101.54.

In implementing the statutory delegation, the DHS has promulgated regulations that provide for periodic exams to ensure that those who have received past public assistance continue to satisfy the eligibility requirements. Ohio Adm.Code 5101:1–2–14(A); Ohio Adm.Code 5101:4–7–07(B)(2)(k). During the reapplication process, the benefit recipient is required to provide the verifications necessary to establish continued eligibility. Ohio Adm.Code 5101:1–2–14(F)(1) and (2); Ohio Adm.Code 5101:4–2–09(I). "Verification" is the use of third-party information or documentation to establish the accuracy of statements on the recipient's reapplication. See, *e.g.,* Ohio Adm.Code 5101:4–2–09(A); Ohio Adm.Code 5101:1–2–20(N); Ohio Adm.Code 5101:1–2–054(A). The reapplication form must also be completed and signed "indicating that the information is accurate." Ohio Adm. Code 5101:1–2–054(A) and (B) (" 'Your Rights and Responsibilities' will need to be signed and dated as part of the interview."); Ohio Adm.Code 5101:1–2–17; Ohio Adm.Code 5101:4–7–07(B)(2)(c); Ohio Adm.Code 5101:4–2–07(F). Failure to cooperate in the eligibility redetermination process results in the termination of benefits. See Ohio Adm.Code 5101:1–2–26(C); Ohio Adm.Code 5101:1–2–14(F)(4); Ohio Adm.Code 5101:4–2–07(F) and (H); Ohio Adm.Code 5101:4–7–07(D).

Appellant insists that she did cooperate and that even with twice striking the words "under penalty of perjury," as well as the word "authorize," from the uniform reapplication, the DHS could have managed to establish eligibility. She also takes the disingenuous approach that because it is her duty to provide the verification, it is irrelevant that the DHS could not determine eligibility. Even if the DHS could not, she claims that it, too, has a duty to assist her in completing

the form and to help verify her eligibility. See Ohio Adm.Code 5101:1–2–14(E)(3); 5101:4–7–07(B)(4).

We recognize initially that the DHS is obligated to assist only if requested, but the duty is limited to ascertaining the eligibility determinants (*i.e.* income, bank account information, citizenship), see Ohio Adm.Code 5101:1–2–14(E)(3), or if already provided, to help ascertain the verifications if the benefit recipient is unable to get them on her own. See Ohio Adm.Code 5101:1–2–20; Ohio Adm.Code 5101:4–2–09 (recipient has "primary responsibility"). These regulations simply do not speak to appellant's situation. Appellant apparently had no problem providing the information at the interview, but she failed to affirm that the information given was truthful in the proscribed manner. Moreover, she did not attempt to provide documentary verifications, nor did she show that her efforts were futile.

We also defer to the DHS's determination as to the consequences of appellant's actions and find no merit in her attempt to trivialize her actions by asserting that the words deleted were superfluous. By twice deleting the phrase "under penalty of perjury" on the "rights and responsibilities" section of the reapplication, appellant provided no assurance as to the veracity of the information and the DHS could not determine that a fraud was not being perpetrated against the system. Likewise, striking the word "authorize" did not permit the DHS to secure otherwise confidential information from private sources. See Ohio Adm. Code 5101:1–2–20(N).

"The purpose of the General Assembly in providing for administrative hearings in particular fields was to facilitate such matters by placing the decision on facts with [agencies] composed of [people] equipped with the necessary knowledge and experience pertaining to a particular field." *Arlen v. State* (1980), 61 Ohio St.2d 168, 173, 15 O.O.3d 190, 194, 399 N.E.2d 1251, 1254–1255. See, also, *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d at 621–622, 614 N.E.2d at 750–751. Besides, neither the statute nor the regulations, in recognizing that the DHS must amass and evaluate staggering amounts of information, express that a benefit recipient may change the uniform reapplication form at all. Caution must temper judicial creativity in the face of legislative or regulatory silence.

Accordingly, despite the various ambiguities and complex interrelation of the regulations, we cannot hold that the "no alteration" policy was clearly erroneous or plainly inconsistent with the wording. See *Larionoff, supra.* In short, the regulations, read together, could establish this construction. While that is not to say that agencies, as experts or specialists in managing regulatory programs, "express an intuition of experience that outruns analysis," we do agree that an agency has latitude in selecting policies deemed in the public interest. *Greater*

*Boston Television Corp. v. Fed. Communications Comm.* (C.A.D.C.1970), 444 F.2d 841, 850–853.

 In addition, the DHS's application of the policy to appellant, whose failure to cooperate resulted from her religious convictions, was not an arbitrary abuse of power. Indeed, DHS's discretion in denying appellant a special exemption from the redetermination process was not unconfined or vagrant, but well within its power. To be sure, the DHS performed its role as the servant of government in enabling the public to repose confidence in the administrative process by its even-handed application of the law. "A court has no authority to control the discretion vested in [the agency by statute], or to substitute its judgment * * * upon any question it is authorized by law to determine." *Brannon v. Bd. of Edn.* (1919), 99 Ohio St. 369, 124 N.E. 235, paragraph two of the syllabus.

 Finally, the regulation reporting the consequences of uncooperativeness was reasonable, without the explicit factors, in conjunction with the broad legislative enactment. We reiterate what the Supreme Court of Ohio has stated in another context:

"In delegating to an administrative division of state government the authority to make and enforce rules and regulations adopted in accordance with the procedural requirements of R.C. 119.01 to 119.13, it is apparent that the General Assembly made a policy decision that specific 'standards' were not necessary to accomplish the 'legislative object sought to be accomplished,' and that it would be 'impossible or impracticable to provide such standards.' " *State v. Schreckengost,* 30 Ohio St.2d at 33, 59 O.O.2d at 62, 282 N.E.2d at 53. DHS did not bypass any ascertainable legislative intent.

The net result of our study and appraisal of the record findings is our conclusion that the trial court did not err in examining the alteration issue which was considered during the administrative proceedings, or in its finding that the DHS's denial of public benefits, on the undisputed facts, was supported by substantial evidence and in accordance with law. The third assignment of error is overruled.

### First Assignment of Error

"The lower court's decision was unreasonable, arbitrary, capricious, and otherwise contrary to law for the reason that it impermissibly infringes on the Appellant's constitutionally guaranteed right to free expression and right to due process of law."

Appellant contends that the Free Exercise Clause of the First Amendment compels the DHS to accommodate a religiously based objection to the statutory

and administrative requirement that she acknowledge her rights and responsibilities on the reapplication form. Upon review of recent United States Supreme Court precedent, we must reject appellant's contention.

I

The Free Exercise Clause of the First Amendment bans laws "prohibiting the free exercise" of religion, and applies to the states via the Fourteenth Amendment. See *Cantwell v. Connecticut* (1940), 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213. The clause is implicated by any religious belief, if sincerely held. The belief need not be based on the tenets of an established religious sect, see *Frazee v. Illinois Dept. of Emp. Sec.* (1989), 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914, or even be "acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Indiana Emp. Sec. Div.* (1981), 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624, 631. However, while the clause excludes all "governmental regulation of religious *beliefs*," see *Sherbert v. Verner* (1963), 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 969, it protects no such absolute right to *conduct* associated with those beliefs. See *Bowen v. Roy* (1986), 476 U.S. 693, 699, 106 S.Ct. 2147, 2151–2152, 90 L.Ed.2d 735, 744. This case implicates only the latter concern.

In *Bowen v. Roy, supra,* the United States Supreme Court specifically addressed an individual's right to a religious exemption from certain general requirements in the welfare and food stamp context. The applicants were Native Americans who feared that providing a Social Security number to the government, as well as its use of the number in administrating the benefit programs, would cause their daughter to lose her soul. The Social Security number provision created opportunities for the government to ferret out fraudulent applications.

In denying the applicants' claim that the government must accommodate a religiously based objection to the requirement that a state welfare agency, in administering AFDC and food stamp benefits, must *use* Social Security numbers of recipients, the court held that the First Amendment did not even apply. See, generally, *id.* at 699–701, 106 S.Ct. at 2151–2153, 90 L.Ed.2d at 744–745. The court noted that mere use of the number did not involve any form of governmental compulsion and that the Free Exercise Clause "does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* at 700, 106 S.Ct. at 2152, 90 L.Ed.2d at 745. Indeed, the court pronounced that "[t]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." *Id.* at 700, 106 S.Ct. at 2152, 90 L.Ed.2d at 744, quoting *Sherbert v.*

*Verner,* 374 U.S. at 412, 83 S.Ct. at 1798, 10 L.Ed.2d at 975 (Douglas, J., concurring). As a result, the court found that "Roy may no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets." *Id.* at 700, 106 S.Ct. at 2152, 90 L.Ed.2d at 744–745.

In considering the challenge to the requirement that each applicant must *provide* a Social Security number to the government, a plurality of the court also found that the objection lacked merit. See, generally, *id.* at 701–712, 106 S.Ct. at 2153–2159, 90 L.Ed.2d at 745–753 (Burger, C.J., joined by Powell and Rehnquist, JJ.). In reaching this conclusion, the plurality distinguished prior jurisprudence which had applied a heightened scrutiny standard, see, *e.g., Thomas v. Review Bd. of Indiana Emp. Sec. Div., supra; Sherbert v. Verner, supra* (government actions that substantially burden a religious practice had to be justified by a compelling government interest to survive a Free Exercise challenge), reasoning that in those cases, "the good cause standard had created a mechanism for individualized exemptions" and "its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent" and "tends to exhibit hostility, not neutrality, toward religion." *Bowen v. Roy,* 476 U.S. at 708, 106 S.Ct. at 2156, 90 L.Ed.2d at 750. It further differentiated other cases utilizing the "compelling interest" test on the basis that in those cases, other constitutional rights besides religion were involved. *Id.* at 703, 106 S.Ct. at 2153–2154, 90 L.Ed.2d at 746; see, *e.g., Cantwell v. Connecticut,* 310 U.S. at 305, 60 S.Ct. at 904, 84 L.Ed. at 1218–1219.

The plurality expressed the view that the strict test was simply not appropriate in the enforcement of a "facially neutral and uniformly applicable requirement for the administration of welfare programs reaching many millions of people," *Bowen v. Roy,* 476 U.S. at 707, 106 S.Ct. at 2156, 90 L.Ed.2d at 749, and determined that, in such a situation, "[applicants] may not use the Free Exercise Clause to demand Government benefits, but only on their own terms * * *." *Id.* at 711–712, 106 S.Ct. at 2158, 90 L.Ed.2d at 752. It found significant the fact that the welfare and food stamp programs are of "truly staggering magnitude" and reasoned that "[g]overnments today grant a broad range of benefits; inescapable at the same time the administration of complex programs requires certain conditions and restrictions" and that "a policy decision by a government that it wishes to treat all applicants alike and that it does not wish to become involved in case-by-case inquiries into the genuineness of each religious objection to such condition or restrictions is entitled to substantial deference." *Id.* at 707, 106 S.Ct. at 2156, 90 L.Ed.2d at 749. The plurality further justified its decision that benefit applicants should not be excused, even for religious reasons, from compliance with a

condition that is binding on all other persons who seek the same benefits from the government because "[t]his is far removed from the historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause of the First Amendment." *Id.* at 703, 106 S.Ct. at 2154, 90 L.Ed.2d at 747.

In *Emp. Div., Dept. of Human Resources of Oregon v. Smith* (1990), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, a majority of the Supreme Court, similar to the plurality opinion in *Bowen v. Roy,* rejected the strict scrutiny standard as a way of adjudicating religiously motivated challenges to neutral, generally applicable laws. In fact, it abandoned balancing altogether, finding such laws automatically enforceable. *Id.* The court declared that " '[o]ur cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government,' " *id.* at 882, 110 S.Ct. at 1602, 108 L.Ed.2d at 888, quoting *Gillette v. United States* (1971), 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168, and therefore concluded that there is no "private right to ignore generally applicable laws." *Id.* at 886, 110 S.Ct. at 1604, 108 L.Ed.2d at 890.

In *Smith,* the issue was whether Oregon could criminalize the possession of the drug peyote and refuse to provide an exemption to American Indians whose use of the drug was a central part of their religious rites. In upholding the statute's ban on peyote, the Supreme Court held that the "right to free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability' on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Id.* at 879, 110 S.Ct. at 1600, 108 L.Ed.2d at 886, quoting *United States v. Lee* (1982), 455 U.S. 252, 263, 102 S.Ct. 1051, 1058, 71 L.Ed.2d 127, 136, fn. 3 (Stevens, J., concurring in judgment).

The majority criticized the use of *Sherbert* balancing when other constitutional protections were not involved or when the situation did not lend itself to individualized governmental assessment of the reasons for the relevant conduct, such as in the unemployment context. See, generally, *id.*; see, also, *Bowen v. Roy, supra,* 476 U.S. at 708, 106 S.Ct. at 2156–2157, 90 L.Ed.2d at 750 (plurality opinion). Indeed, it explained that its abandonment of the most rigorous scrutiny was warranted because "[t]o make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling'—permitting him, by virtue of his beliefs, 'to become a law unto himself,' * * *—contradicts both constitutional tradition and common sense." *Smith,* 494 U.S. at 885, 110 S.Ct. at 1603, 108 L.Ed.2d at 890, quoting *Reynolds v. United States* (1879), 98 U.S. 145, 167, 25 L.Ed. 244, 250. The court prophesied that any society deeming such laws which do not protect

interests of the highest order presumptively invalid, as applied to the religious objector, would be "courting anarchy" as " 'we are a cosmopolitan nation made up of people of almost every conceivable religious preference.' " *Id.* at 888, 110 S.Ct. at 1605, 108 L.Ed.2d at 892, quoting *Braunfeld v. Brown* (1961), 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563, 568.

While *Smith* concerned the conflict between a criminal statute and behavior allegedly protected by the Free Exercise Clause, the Supreme Court has since extended its holding to civil laws as well. In *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993), 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472, it applied the categorical rule articulated in *Smith,* pronouncing that "our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531, 113 S.Ct. at 2226, 124 L.Ed.2d at 489. However, the court also determined that strict scrutiny will be triggered if the law or government policy fails to meet either requirement. *Id.*

While explaining that neutrality and general applicability are "interrelated," the court attempted to distinguish the requirements, stating that at a minimum, a law is not neutral if its purpose is the "suppression of religion or religious conduct." *Id.* at 533, 113 S.Ct. at 2227, 124 L.Ed.2d at 489–490. In determining the object of the law, a court must inquire as to whether the law discriminates on its face by referring to a religious practice "without a secular meaning discernible from the language or context." *Id.* at 533, 113 S.Ct. at 2227, 124 L.Ed.2d at 491. Discrimination is also demonstrated by laws targeting religious conduct for disfavorable treatment, as "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* A law is not of general application if, *inter alia,* the secular ends asserted in defense of the law are pursued only against conduct motivated by religious beliefs. See *id.* at 543–546, 113 S.Ct. at 2232–2233, 124 L.Ed.2d at 497–498.

In applying the analytical construct articulated in *Smith,* the court in *Lukumi Babalu Aye* held void city zoning ordinances regulating animal sacrifice which in effect prohibited only sacrifice as practiced by a certain religion. The court found that the laws not only had an impermissible object, but also violated the principle of general applicability. *Id.* at 533–546, 113 S.Ct. at 2227–2232, 124 L.Ed.2d at 491–498. Subjected, then, to the most rigorous scrutiny, the challenged enactments were invalidated. *Id.* at 544–547, 113 S.Ct. at 2233–2234, 124 L.Ed.2d at 498–500.

## II

In the case at bar, we do not face questions about the sincerity or the religious nature of appellant's convictions. Her views are clearly "rooted in religion" and

certainly not "purely secular." *Frazee v. Illinois Dept. of Emp. Sec.*, 489 U.S. at 833, 109 S.Ct. at 1517, 103 L.Ed.2d at 919. Appellant explains her beliefs as follows:

"I am a Christian woman—to me that means a deep and loving commitment to the Lord—and I take the Bible (King James Version) God's word very seriously. Therefore I do not pick and choose which scriptures I choose to follow—but try to follow all of God's word. Words are very important to God as the scripture says: 'For by thy words thou shalt be justified, and by thy words thou shalt be condemned.' Matthew 12:37.

"* * *

"The Bible is real clear, it says that * * * 'But I say unto you, Swear not at all; neither by heaven; for it is God's throne: Nor by the earth; for it is his footstool; neither by Jerusalem; for it is the city of the great King. Neither shalt thou swear by thy head, because thou canst not make one hair white or black. But let your communication be, Yea, yea; Nay, nay for whatsoever is more than these cometh of evil.' Matthew, Chapter 5, verses 34–36."

As discussed above, appellant believes that certain words such as "under penalty of perjury" and "authorize" are swearing which the Bible forbids, and that she must not use them in order to honor her "Heavenly Father's word."

The DHS has never argued that appellant's views are not a "religious belief" within the meaning of the First Amendment, nor has it ever questioned her sincerity. We therefore accept appellant's contention that the stricken words are forbidden by her faith and also find that her claim is not "so bizarre, so clearly nonreligious in motivation" that the Free Exercise Clause would not entitle her to protection. *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. at 715, 101 S.Ct. at 1435, 67 L.Ed.2d at 632. Indeed, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith," or the "plausibility of a religious claim." *Smith, supra*, 494 U.S. at 887, 110 S.Ct. at 1604, 108 L.Ed.2d at 891. "Courts are not arbiters of scriptural interpretation," and should not "dissect religious beliefs because * * * [such] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas, supra*, 450 U.S. at 715–716, 101 S.Ct. at 1430–1431, 67 L.Ed.2d at 632.

■ However, while appellant's religion is the kind protected by the First Amendment, the DHS's "no alteration" policy is neutral and generally applicable. Neither the policy nor the rules from which it derives discriminate on their face or in effect. Indeed, the rules relating to verification, completeness, and coopera- tion do not single out religion, by their text, for disfavorable treatment. In addition, the rules, in operation, do not suggest any religious animosity. To the

contrary, the DHS completely disregarded her reasons for failing to cooperate. While the DHS now claims it will allow a benefit recipient to provide an equivalent "rights and responsibilities" form so long as it meets the DHS's concerns regarding the prevention of fraud, the DHS asserts that this supplement to its prior policy also applies without regard to religion. Thus, the record contains no evidence of an "official purpose to disapprove of a particular religion or of religion in general," see *Lukumi Babalu Aye*, 508 U.S. at 532, 113 S.Ct. at 2226, 124 L.Ed.2d at 489, or any "religious gerrymandering" to proscribe only religious objections to the words on the reapplication. See *id.* at 533–535, 113 S.Ct. at 2227–2228, 124 L.Ed.2d at 491, quoting *Walz v. Tax Comm. of New York City* (1970), 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697, 717 (Harlan, J., concurring).

Moreover, both the rules and the policy apply to all benefit recipients and do not selectively impose burdens on conduct motivated by religious belief, such as appellant's. See *Lukumi Babalu Aye*, 508 U.S. at 541–543, 113 S.Ct. at 2231–2232, 124 L.Ed.2d at 496. In fact, in allowing her to substitute her own "rights and responsibilities" form, there is no burden on appellant's religion at all. *Bowen v. Roy, supra.* There is no constitutional significance in the "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs." *Lyng v. N.W. Indian Cemetery Protection Assn.* (1988), 485 U.S. 439, 450, 108 S.Ct. 1319, 1326, 99 L.Ed.2d 534, 547. Appellant has been given the means to fulfill the tenets of her religion and has access to an attorney if she feels she would need such assistance in finding the appropriate replacement words or form. See Ohio Adm.Code 5101:1–2–073.[2]

Further, the "no alteration" policy is not of the type that involved individualized exceptions which are designed to examine every recipient's reason for their conduct, such as the "good cause" requirement in the unemployment context where the government allowed exemptions for other personal reasons. While the DHS workers, who are classified employees, must assist an applicant or recipient to fill in the form, there is no provision which gives them the authority to alter it. Indeed, in accepting an equivalent version of appellant's "rights and responsibilities," there was some delay as appellant's formulation had to be approved and implemented through a hierarchy of political channels. Therefore, both during the time that the DHS required appellant to complete the form without alteration, and later when the DHS included within its policy the allowance for

---

2. Ohio Adm.Code 5101:1–2–073(T) requires each worker, during the interview, to advise the applicant on the availability of free legal services.

substitution, the policy was generally applicable to all individuals, regardless of their reasons for changing the form.

Accordingly, pursuant to *Smith*, appellant's claim that the government must conform its forms to her beliefs must fail. Because it is not the object of the regulatory policy, but merely the incidental effect of generally applicable and otherwise valid provisions, the First Amendment has not been offended. See *Smith*, 494 U.S. at 878, 110 S.Ct. at 1599–1600, 108 L.Ed.2d at 885. "[G]iven the diversity of beliefs in our pluralistic society and the necessity of providing governments with sufficient operating latitude, some incidental neutral restraints on the free exercise of religion are inescapable." *Bowen v. Roy*, 476 U.S. at 712, 106 S.Ct. at 2158, 90 L.Ed.2d at 752. "Claims of religious conviction do not automatically entitle a person to fix unilaterally the conditions and terms of dealing with the government. Not all burdens on religion are unconstitutional." *Id.* at 702, 106 S.Ct. at 2153, 90 L.Ed.2d at 746 (plurality opinion), citing *Reynolds v. United States* (1879), 98 U.S. 145, 25 L.Ed. 244. Appellant's first assignment of error is overruled.

## Second Assignment of Error

"The lower court's decision was unreasonable, arbitrary, capricious, and otherwise contrary to law for the reason that it impermissibly infringes on the Appellant's statutorily guaranteed right to Free exercise under the Religious Freedom Restoration Act of 1993."

Appellant argues that her statutory right to freely exercise her religion was violated because the DHS's denial of public benefits, predicated on her reapplication alterations, does not withstand strict scrutiny. We disagree.

Appellant did not bring her federal claim to the attention of the trial court. Rather, she provided a notice of appeal and demand for judgment which failed to specify with any exactitude the substance of her claims. Therefore, as we held in appellant's fourth assignment of error pertaining to supposed procedural inadequacies of the DHS decision, errors alleged in an agency's decision will not be reviewed by a court of appeals, absent plain error, unless assigned and argued to the court of common pleas. *Kramp v. Ohio State Racing Comm.* (1991), 81 Ohio App.3d 186, 192, 610 N.E.2d 1013, 1017. The second assignment of error is overruled.

## Fifth Assignment of Error

"The lower court's decision was unreasonable, arbitrary, capricious, and otherwise contrary to law for the reason that the Appellant was not provided her rights as an appellant as provided for in O.R.C. 119.12."

■ Appellant claims that the trial court erred by failing to hold a hearing. She urges us to disregard Supreme Court precedent, see *Ohio Motor Vehicle Dealers Bd. v. Cent. Cadillac Co.* (1984), 14 Ohio St.3d 64, 14 OBR 456, 471 N.E.2d 488, as well as to reconsider our holding consistent with that opinion, see *Kramp v. Ohio State Racing Comm. supra,* which grants a trial court the power to conduct a review solely upon the administrative record. We decline appellant's invitation to mandate oral hearings on every administrative appeal to the court of common pleas.

R.C. 119.12, applied to appeals from administrative agencies pursuant to R.C. 5101.35(E), provides:

"The court shall conduct a hearing on such appeal * * *. The hearing in the court of common pleas shall proceed as in the trial of a civil action, and the court shall determine the rights of the parties in accordance with the laws applicable to such action. At such hearing, counsel *may* be heard on oral argument, briefs *may* be submitted, and evidence introduced if the court has granted a request for the presentation of additional evidence." (Emphasis added.)

In *Ohio Motor Vehicle Dealers Bd., supra,* 14 Ohio St.3d at 67, 14 OBR at 459, 471 N.E.2d at 491–492, the Ohio Supreme Court interpreted this provision to permit, but not require, additional evidence and briefing, including oral argument. The unanimous court pronounced:

"R.C. 119.12 requires only a hearing. The hearing may be limited to a review of the record, or, at the judge's discretion, the hearing may involve the acceptance of briefs, oral argument and/or newly discovered evidence." *Id.;* see, also, *Kramp, supra,* 81 Ohio App.3d at 189–190, 610 N.E.2d at 1015–1016.

■ Appellant claims that this reading of the statute is too restrictive and, as applied in the present case, unfair because it denied her an opportunity to clarify the issues. Yet, as we stated in *Kramp, supra,* 81 Ohio App.3d at 190, 610 N.E.2d at 1016, "[t]his interpretation is entirely consistent with this court's understanding of the term 'hearing' as applied in standard civil practice." Citing *Brown v. Akron Beacon Journal* (1991), 81 Ohio App.3d 135, 139, 610 N.E.2d 507, 509. We also note that appellant had four opportunities to be heard concerning her objection to the language on the reapplication form.[3] She took full advantage of the administrative process, stating her objections and the underlying religious reasons, both orally and in writing. As discussed above, the state and administrative appeal decisions summarized the salient facts, and articulated its reasons

---

3. *I.e.,* county hearing decision, state hearing decision, administrative appeal decision, and the trial court judgment.

with reasonable clarity, denying appellant benefits for her failure to cooperate with the reapplication rules.

Most significant, on appeal to the court of common pleas, appellant did not, at any point in the trial proceedings, express an intention to present additional evidence. She also made no attempt to comply with the local procedural time limits concerning the submission of a trial brief or the request for an oral hearing. See Loc.R. 19 of the Court of Common Pleas of Summit County, General Division. In fact, appellant failed to submit any brief or request at all. See *Ohio Motor Vehicle Dealers Bd.; Kramp.* Instead, she rested on her notice of appeal and demand for judgment, in addition to the complete administrative record, and failed to object when the trial court conducted its review of the entire record as presented.

Consequently, we find that the trial court was well within its discretion to limit the hearing to a review of the administrative proceedings. Appellant's fifth assignment of error is overruled.

The judgment of the court of common pleas is affirmed.

*Judgment affirmed.*

DICKINSON, J., concurs.

REECE, P.J., concurs in judgment only.