

Opinions of the United
States Court of Appeals
for the Third Circuit

3-3-1999

# F.O.P, Newark, et.al. v. City of Newark, et.al.

Precedential or Non-Precedential:

Docket 97-5542

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"F.O.P, Newark, et.al. v. City of Newark, et.al." (1999). *1999 Decisions.* Paper 54.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/54

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 3, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5542

FRATERNAL ORDER OF POLICE
NEWARK LODGE NO. 12;
FARUQ ABDUL-AZIZ; SHAKOOR MUSTAFA

v.

CITY OF NEWARK; NEWARK POLICE DEPARTMENT;
JOSEPH J. SANTIAGO, NEWARK POLICE DIRECTOR;
THOMAS C. O'REILLY, NEWARK CHIEF OF POLICE,
Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil No. 97-02672)
(District Judge: Honorable John W. Bissell)

Argued: June 25, 1998

Before: GREENBERG, ALITO, and McKEE, Circuit Judges

(Opinion Filed: March 3, 1999)

        MICHELLE HOLLAR-GREGORY
        DARRYL M. SAUNDERS (Argued)
        City of Newark
        920 Broad Street
        Newark, NJ 07102

        Counsel for Appellants

ROBERT R. CANNAN (Argued)
MARIO E. DIRIENZO
Spevack & Cannan
525 Green Street
Iselin, NJ 08830

Counsel for Appellees

KEVIN J. HASSON (Argued)
ERIC W. TREENE
ROMAN STORZER
The Becket Fund for Religious
 Liberty
2000 Pennsylvania Ave. NW,
 Suite 3580
Washington, DC 20006

RONALD K. CHEN
DAVID ROCAH
American Civil Liberties Union of
 New Jersey
2 Washington Place
Newark, NJ 07102

STEVEN M. FREEMAN
DAVID ROSENBERG
ERICA M. BROIDO
LAUREN LEVIN
Anti-Defamation League
823 United Nations Plaza
New York, NY 10017

Counsel for Amici Curiae in Support
of Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

This appeal presents the question whether the policy of the Newark (N.J.) Police Department regarding the wearing of beards by officers violates the Free Exercise Clause of the First Amendment. Under that policy, which the District Court held to be unconstitutional, exemptions are made for medical reasons (typically because of a skin condition called pseudo folliculitis barbae), but the Department refuses to make exemptions for officers whose religious beliefs prohibit them from shaving their beards. Because the Department makes exemptions from its policy for secular reasons and has not offered any substantial justification for refusing to provide similar treatment for officers who are required to wear beards for religious reasons, we conclude that the Department's policy violates the First Amendment. Accordingly, we affirm the District Court's order permanently enjoining the Department from disciplining two Islamic officers who have refused to shave their beards for religious reasons.

I

Since 1971, male officers in the Newark Police Department have been subject to an internal order that requires them to shave their beards. In relevant part, the order provides:

> Full beards, goatees or other growths of hair below the lower lip, on the chin, or lower jaw bone area are prohibited.

App. at 94 (Special Order from the Chief of Police No. 71-15, p.2 ("Order 71-15")). The order permits officers to wear mustaches and sideburns, id., and it allows exemptions from the "no-beard" rule for undercover officers whose "assignments or duties permit a departure from the requirements." Id. at 93. See Appellees' Br. at 14; Reply Br. at 9.

3

Officers Faruq Abdul-Aziz and Shakoor Mustafa are both devout Sunni Muslims who assert that they believe that they are under a religious obligation to grow their beards. See App. at 9-10; Supp. App. 3-4. According to the affidavit of an imam, "it is an obligation for men who can grow a beard, to do so" and not to shave. Supp. App. at 3. The affidavit continues:

> . . . The Quran commands the wearing of a beard implicitly. The Sunnah is the detailed explanation of the general injunctions contained in the Quran. The Sunnah says in too many verses to recount [:]"Grow the beard, trim the mustache."

> . . . I teach as the Prophet Mohammed taught that the Sunnah must be followed as well as the Quran. This in the unequivocal teaching for the past 1,418 years, by the one billion living Sunni Muslims world wide.

> . . . The refusal by a Sunni Muslim male who can grow a beard, to wear one is a major sin. I teach based upon the way I was taught and it is understood in my faith that the non-wearing of a beard by the male who can, for any reason is as [serious] a sin as eating pork.

> . . . This is not a discretionary instruction; it is a commandment. A Sunni Muslim male will not be saved from this major sin because of an instruction of another, even an employer to shave his beard and the penalties will be meted out by Allah.

Supp. App. at 4. The defendants have not disputed the sincerity of the plaintiffs' beliefs.[1]

When Aziz and Mustafa were questioned about their non-compliance with Order 71-15, they informed Department officials that they were growing their beards for religious reasons. See Supp. App. at 1 & 5. This explanation was apparently deemed inadequate, and Mustafa received a Preliminary Notice of Disciplinary Action in July 1996 charging him with disobeying an oral command to comply

_____

1. Cf. Lewis v. Scott, 910 F.Supp. 282, 287 (E.D. Tex. 1995) (testimony of an Islamic chaplin regarding whether a beard is obligatory).

with Order 71-15. App. at 96-97. Aziz received a similar notice in January 1997. Id. at 98-99. In both cases, the notices informed the officers that their actions might warrant "removal" from the Department. Id. at 96 & 98.

On January 24, 1997, Chief of Police Thomas C. O'Reilly announced a "Zero Tolerance" policy for officers who were not in compliance with Order 71-15 and had not received "medical clearance" to wear a beard. App. at 95 (Memorandum from the Chief of Police No. 97-30 ("Memo 97-30")). Consistent with this policy, the Department ordered Officers Aziz and Mustafa to appear for disciplinary hearing in May 1997.

Prior to the hearing, Mustafa and Aziz filed a complaint in the District Court requesting permanent injunctive relief on the ground that the Department's enforcement of Order 71-15 would violate their rights under the Free Exercise Clause of the First Amendment.[2] After the defendants filed a motion to dismiss, and the plaintiffs filed a motion for summary judgment, the District Court held a hearing and concluded that the Department's application of Order 71-15 to Mustafa and Aziz would violate their free exercise rights. Accordingly, the District Court permanently enjoined the defendants "from disciplining or otherwise disadvantaging Plaintiffs Aziz and Mustafa for violating Order 71-15 or any other directive which would require them to shave or trim their beards in violation of their religious beliefs." App. at 23.

II

The Free Exercise Clause of the First Amendment, which has been made applicable to the States through the Fourteenth Amendment, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. For many years, the Supreme Court appeared to interpret the free exercise clause as requiring

_____

2. Mustafa and Aziz brought several other claims, all of which were dismissed by the District Court. See App. at 15-16. The plaintiffs have not appealed these dismissals.

5

the government to make religious exemptions from neutral, generally applicable laws that have the incidental effect of substantially burdening religious conduct. See Wisconsin v. Yoder, 406 U.S. 205, 220 (1972) ("[T]here are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability."); see also Frazee v. Illinois Dep't of Employment Sec., 489 U.S. 829, 832–34 (1989); Thomas v. Review Bd. of Indiana Employment Div., 450 U.S. 707, 717 (1981); Sherbert v. Verner, 374 U.S. 398, 403–404 (1963). In these cases, the Court required the government to meet "strict scrutiny" when application of a given law or regulation served to impose a substantial burden on religious activity. See Thomas, 450 U.S. at 718 ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."); Yoder, 406 U.S. at 215 ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").

In 1986, a plurality of the Court raised doubts about the breadth of the Court's "exemption" jurisprudence and proposed a new approach. See Bowen v. Roy, 476 U.S. 693, 703–08 (1986) (Burger, C.J., joined by Rehnquist and Powell, J.J.). In Roy, a mother and father who wished to participate in the Aid to Families with Dependent Children program objected on religious grounds to the requirement that they furnish their daughter's Social Security number as a condition of receiving benefits. Id. at 695. Although the Court's precedent indicated that these circumstances were sufficient to trigger strict scrutiny because the government had "condition[ed] receipt of an important benefit upon conduct proscribed by a religious faith," Thomas, 450 U.S. at 717–718, the plurality opinion applied rational basis review. Roy, 476 U.S. at 707–08. The opinion explained:

> We conclude . . . that government regulation that indirectly and incidentally calls for a choice between securing a governmental benefit and adherence to religious beliefs is wholly different from governmental action or legislation that criminalizes religiously inspired activity or inescapably compels conduct that

6

some find objectionable for religious reasons. Although the denial of government benefits over religious objection can raise serious Free Exercise problems, these two very different forms of government action are not governed by the same constitutional standard.

Id. at 706 (emphasis added). See also id. at 704.

In sum, the plurality proposed that the Court continue to apply heightened scrutiny to neutral, generally applicable laws that burden religious activity by affirmatively compelling or prohibiting conduct, but apply rational basis scrutiny to neutral, generally applicable rules governing benefits programs. However, rather than advocating the overruling of the Court's prior benefits-exemption cases, such as Sherbert and Thomas, the plurality distinguished those decisions on the ground that they concerned laws that already included "mechanism[s] for individualized exemptions." Roy, 476 U.S. at 708. The plurality explained that if "a state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent," and it is "appropriate to require the State to demonstrate a compelling reason for denying the requested exemption." Id. Since the statutory framework at issue in Roy did not provide for individualized exemptions, the plurality did not believe that the Court's prior benefits decisions were controlling.

The Roy plurality's attempt to distinguish the Court's previous decisions and apply rational basis review failed to garner a majority of the Court. See id. at 715–16 (Blackmun, J., concurring in part); id. at 728–32 (O'Connor, J., joined by Brennan and Marshall, J.J., concurring in part and dissenting in part); id. at 733 (White, J., dissenting). In 1990, however, the legal landscape changed dramatically when the Supreme Court handed down its decision in Employment Div., Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990). Smith concerned two individuals who were denied state unemployment compensation benefits after being fired from their jobs for ingesting peyote, a controlled substance under Oregon law. Id. at 874. The individuals challenged the denial of benefits on the ground that they were entitled to religious exemptions since they had ingested peyote for sacramental

7

purposes at a ceremony of the Native American Church. Declining to apply strict scrutiny, the Court concluded that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Smith, 494 U.S. at 879 (quotations omitted). See also id. at 878 (explaining that "if prohibiting the exercise of religion" is "merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended"). Accordingly, the Court held that Oregon could, consistent with the Free Exercise Clause, criminalize religious peyote use and deny unemployment compensation benefits to individuals whose job dismissals resulted from such use. Id. at 890.

The Smith Court, however, did not overrule its prior free exercise decisions, but rather distinguished them. See Smith, 494 U.S. at 881–884.3 In this case, the plaintiffs contend that their Free Exercise claim is not governed by the generally applicable Smith rule but is instead governed by the Court's pre-Smith decisions. In this connection, the plaintiffs make three arguments. First, they contend that the Smith decision should be limited to cases involving criminal prohibitions. Second, they argue that the Smith analysis does not apply to government rules that, like the "no-beard" policy, already make secular exemptions for certain individuals. Finally, they maintain that the Smith rule does not bar their exemption claim because they are relying on both the Free Exercise Clause and the Free Speech Clause. The District Court accepted the plaintiffs' first argument, applied the Court's pre-Smith jurisprudence, and concluded that the Free Exercise Clause prohibits the Department from enforcing its "no-beard" policy against Aziz and Mustafa. While we disagree with the District Court's conclusion that Smith is limited to the criminal context, we believe that the plaintiffs are entitled to a religious exemption since the Department already makes secular exemptions. As a result, we need not reach

_____

3. See generally Note, James M. Oleske, Jr., Undue Burdens and the Free Exercise of Religion: Reworking a "Jurisprudence of Doubt", 85 Geo. L.J. 751 (1997).

the plaintiffs' "hybrid" free speech/free exercise argument.4 See generally Smith, 494 U.S. at 881–882 (distinguishing "hybrid" claims from free exercise claims).

III

A

Aziz and Mustafa first contend that the Smith rule applies only to cases involving criminal prohibitions. Since this case concerns a non-criminal prohibition, Aziz and Mustafa argue that the Court's pre–Smith decisions govern and heightened scrutiny applies. This position, however, has already been rejected by our court. See Salvation Army v. Department of Community Affairs of New Jersey, 919 F.2d 183, 194–96 (3d Cir. 1990). Salvation Army involved a claim by The Salvation Army ("TSA") that it was entitled to a religious exemption from the requirements of the New Jersey Rooming and Boarding House Act of 1979, N.J. Stat. Ann. S 55:13B–1 (West 1989), and the regulations promulgated thereunder. Salvation Army, 919 F.2d. at 185. Like Aziz and Mustafa, TSA argued that "the Court's holding in Smith was limited to free exercise challenges to neutral, generally applicable criminal statutes ." Id. at 194 (emphasis in original). Our response was unequivocal: "We cannot accept this interpretation of Smith." Id.

In addition to the analysis provided in Salvation Army, see 919 F.2d at 194–96, we believe there are two further reasons to conclude that Smith is not limited to cases involving criminal statutes. First, under a contrary reading of Smith, the Free Exercise Clause would not be implicated when the government prohibits religious conduct through generally applicable laws, Smith, 494 U.S. at 878–79, but would be implicated when the government imposes a lesser burden on religion through a generally applicable civil

_____

4. We do note, however, that the plaintiffs failed to allege a free speech violation in their complaint, see App. at 83–92, and explicitly disavowed such a claim before the District Court. See App. at 58 (July 18, 1997 Hearing) (counsel for plaintiffs) ("We can all agree that freedom of expression would not extend to the wearing of beards.").

regulation. This counter-intuitive interpretation of the First Amendment is undermined by the very language of the Smith opinion:

> [I]f a state has prohibited through its criminal laws certain kinds of religiously motivated conduct without violating the First Amendment, it certainly follows that it may impose the lesser burden of denying unemployment compensation benefits to persons who engage in that conduct.

Smith, 494 U.S. at 875 (quotation omitted) (emphasis added). See also id. at 898-99 (opinion of O'Connor, J., joined by Brennan, Marshall, and Blackmun, J.J.) ("A neutral criminal law prohibiting conduct that a State may legitimately regulate is, if anything, more burdensome than a neutral civil statute placing legitimate conditions on the award of a state benefit.").

Second, the Supreme Court's most recent characterization of Smith supports our holding in Salvation Army that Smith is not limited to the criminal context. In City of Boerne v. Flores, 117 S. Ct. 2157 (1997), the Supreme Court stated:

> Smith held that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.

Id. at 2161. Nowhere in its discussion of Smith did the Flores Court indicate that the Smith decision only applied to generally applicable criminal laws. In fact, the law at issue in Flores was a non-criminal landmark ordinance. See Flores, 117 S. Ct. at 2160. If the plaintiffs are correct, and Smith does not apply to non-criminal provisions, there would have been no need for the Flores Court even to discuss Smith. However, the Flores Court did much more than to discuss Smith; it struck down the Religious Freedom Restoration Act of 1993, insofar as it applied to the states, for the very reason that it was inconsistent with Smith. See Flores, 117 S. Ct. at 2171-72. In light of Flores, it is difficult to say that Smith has no application to cases involving non-criminal statutes.

Because this court has already rejected the argument that Smith is limited to cases involving criminal statutes,

10

and because that rejection is amply supported by both the Smith opinion itself and recent Supreme Court case law, we cannot agree with the plaintiffs and the District Court that Smith is distinguishable on the ground that it concerned a criminal statute.

B

Aziz and Mustafa's second argument is that the Department's refusal to make religious exemptions from its no-beard policy should be reviewed under strict scrutiny because the Department makes secular exemptions to its policy. This contention rests on the following passage from Smith in which the Court explained why some of its earlier religious exemption cases had applied strict scrutiny:

> The statutory conditions in Sherbert and Thomas provided that a person was not eligible for unemployment compensation benefits if, `without good cause,' he had quit work or refused available work. The `good cause' standard created a mechanism for individualized exemptions. As the plurality pointed out in Roy, our decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason.

Smith, 494 U.S. at 884 (quotations, citations, and alterations omitted).

The Court reiterated this understanding of its religious exemption jurisprudence, and applied it outside the unemployment compensation context, in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 537-38 (1993). In Lukumi, the Court reviewed several municipal ordinances regulating the slaughter of animals, one of which prescribed punishments for "[w]hoever . . . unnecessarily . . . kills any animal." Id. at 537. The Court explained that this ordinance could not be applied to punish the ritual slaughter of animals by members of the Santeria religion when the ordinance was not applied to secular killings:

11

>        [B]ecause [the ordinance] requires an evaluation of the
>        particular justification for the killing, this ordinance
>        represents a system of individualized governmental
>        assessment of the reasons for the relevant conduct. As
>        we noted in Smith, in circumstances in which
>        individualized exemptions from a general requirement
>        are available, the government may not refuse to extend
>        that system to cases of "religious hardship" without
>        compelling reason. Respondent's application of the test
>        of necessity devalues religious reasons for killing by
>        judging them to be of lesser import than nonreligious
>        reasons. Thus religious practice is being singled out for
>        discriminatory treatment.

Lukumi, 508 U.S. at 537-38 (emphasis added) (quotations
and citations omitted).5

Aziz and Mustafa contend that, since the Department
provides medical -- but not religious -- exemptions from its
"no-beard" policy,6 it has unconstitutionally devalued their
religious reasons for wearing beards by judging them to be
of lesser import than medical reasons. The Department, on
the other hand, maintains that its distinction between
medical exemptions and religious exemptions does not
represent an impermissible value judgment because
medical exemptions are made only so as to comply with the
Americans with Disabilities Act ("ADA"), 42 U.S.C. S 12101

_____

5. See also Roy, 476 U.S. at 708 (plurality opinion):

>        If a state creates a mechanism [for exemptions], its refusal to
extend
>        an exemption to an instance of religious hardship suggests a
>        discriminatory intent. Thus . . . to consider a religiously
motivated
>        resignation to be "without good cause" tends to exhibit hostility,
not
>        neutrality, towards religion.

6. In their reply brief, the defendants argue for the first time that the
District Court "incorrectly decided the City of Newark has a medical
exception." Reply Br. at 14. We will not entertain this argument as it
conflicts with the defendants' position both in the District Court and in
their opening brief to this court. See Defendants' Answer P 3; Brief in
Support of Defendants' Motion to Dismiss at 11; Appellants' Br. at 11.
Moreover, we are at a loss to understand the defendants' new position
given that Memo 97-30 clearly provides exemptions from the "Zero
Tolerance" policy for those who "have received medical clearance." App.
at 95.

(1994). See Brief in Support of the Defendants' Motion to Dismiss at 11. While this argument initially appears persuasive, it ultimately cannot be sustained.

It is true that the ADA requires employers to make "reasonable accommodations" for individuals with disabilities. 42 U.S.C. S 12111(b)(5)(A) (1994). However, Title VII of the Civil Rights Act of 1964 imposes an identical obligation on employers with respect to accommodating religion. 42 U.S.C. S 2000e(j) (1994). This parallel requirement undermines the Department's contention that it provides a medical exception, but not a religious exception, because it believes that "the law may require" a medical exception. Brief in Support of Defendants' Motion to Dismiss at 11. Furthermore, it is noteworthy that the Department has clearly been put on notice of Title VII's religious accommodation requirements. See EEOC Determination Letter, Charge No. 171970408 (attached to Plaintiffs' Letter Brief in Response to Defendants' Cross Motion for Summary Judgment); App. at 83 (Plaintiffs' Complaint) (citing Title VII). In light of these circumstances, we cannot accept the Department's position that its differential treatment of medical exemptions and religious exemptions is premised on a good-faith belief that the former may be required by law while the latter are not.

We also reject the argument that, because the medical exemption is not an "individualized exemption," the Smith/Lukumi rule does not apply. See App. at 19 (Dist. Ct. Op. at 12). While the Supreme Court did speak in terms of "individualized exemptions" in Smith and Lukumi, it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection. See generally Lukumi, 508 U.S. at 542 (1992) ("All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice.) (emphasis added). Therefore,

13

we conclude that the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under Smith and Lukumi.

Contrary to the Department's contention, our decision to apply heightened scrutiny is entirely consistent with the result in Smith. In Smith, the Court upheld an Oregon law that prohibited the "knowing or intentional possession of a `controlled substance' unless the substance has been prescribed by a medical practitioner." Smith, 494 U.S. at 874. The Department argues that, since the prescription exception did not prompt the Smith Court to apply heightened scrutiny to the Oregon law, we should not apply heightened scrutiny in the instant case based on the Department's allowance of medical exemptions. See Appellants' Br. at 8-9. This argument, however, overlooks a critical difference between the prescription exception in the Oregon law and the medical exemption in this case.

The Department's decision to allow officers to wear beards for medical reasons undoubtably undermines the Department's interest in fostering a uniform appearance through its "no-beard" policy. By contrast, the prescription exception to Oregon's drug law does not necessarily undermine Oregon's interest in curbing the unregulated use of dangerous drugs. Rather, the prescription exception is more akin to the Department's undercover exception, which does not undermine the Department's interest in uniformity because undercover officers "obviously are not held out to the public as law enforcement person[nel]." Reply Br. at 9. The prescription exception and the undercover exception do not trigger heightened scrutiny because the Free Exercise Clause does not require the government to apply its laws to activities that it does not have an interest in preventing. However, the medical exemption raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not. As discussed above, when the government makes a value judgment in favor of

14

secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.[7]

C

The Department has not offered any interest in defense of its policy that is able to withstand any form of heightened scrutiny. The Department contends that it wants to convey the image of a " `monolithic, highly disciplined force' " and that "[u]niformity [of appearance] not only benefits the men and women that risk their lives on a daily basis, but offers the public a sense of security in having readily identifiable and trusted public servants." Appellant's Brief at 14 (citation omitted). We will address separately all of the interests that we can discern in this passage.

The Department hints that other officers and citizens might have difficulty identifying a bearded officer as a genuine Newark police officer and that this might undermine safety. But while safety is undoubtedly an interest of the greatest importance, the Department's partial no-beard policy is not tailored to serve that interest. Uniformed officers, whether bearded or clean-shaven, should be readily identifiable. Officers who wear plain clothes are not supposed to stand out to the same degree as uniformed officers, and in any event the Department permits such officers to wear beards for medical reasons. The Department does not contend that these medical exemptions pose a serious threat to the safety of the members of the force or to the general public, and there is no apparent reason why permitting officers to wear beards for religious reasons should create any greater difficulties in this regard.

The Department also suggests that permitting officers to wear beards for religious reasons would undermine the

_____

7. While Smith and Lukumi speak in terms of strict scrutiny when discussing the requirements for making distinctions between religious and secular exemptions, see Smith, 494 U.S. at 884 (requiring a "compelling reason"); Lukumi, 508 U.S. at 537 (same), we will assume that an intermediate level of scrutiny applies since this case arose in the
public employment context and since the Department's actions cannot survive even that level of scrutiny.

15

force's morale and esprit de corps. However, the Department has provided no legitimate explanation as to why the presence of officers who wear beards for medical reasons does not have this effect but the presence of officers who wear beards for religious reasons would. And the same is true with respect to the Department's suggestion that the presence of officers who wear beards for religious reasons would undermine public confidence in the force. We are at a loss to understand why religious exemptions threaten important city interests but medical exemptions do not. Conceivably, the Department may think that permitting officers to wear beards for religious reasons would present a greater threat to the sense of uniformity that it wishes to foster because the difference that this practice highlights -- namely, a difference in religious belief and practice -- is not superficial (like the presence of pseudo folliculitis barbae) and thus may cause divisions in the ranks and among the public. (There is no doubt that religious differences have been a cause of dissension throughout much of human history.) But if this is the Department's thinking -- and we emphasize that the Department has not spelled out this argument in so many words -- what it means is that Sunni Muslim officers who share the plaintiffs' religious beliefs are prohibited from wearing beards precisely for the purpose of obscuring the fact that they hold those beliefs and that they differ in this respect from most of the other members of the force. In other words, if this is the real reason for the distinction that is drawn between medical and religious exemptions, we have before us a policy the very purpose of which is to suppress manifestations of the religious diversity that the First Amendment safeguards. Before sanctioning such a policy, we would require a far more substantial showing than the Department has made in this case. We thus conclude that the Department's policy cannot survive any degree of heightened scrutiny and thus cannot be sustained.8

_____

8. We also reject the defendants' argument that the District Court erred in awarding some $12,000 in attorney's fees in favor of the plaintiffs. The defendants argue that this amount was unnecessary because the plaintiffs might have prevailed without federal court litigation had they pursued available administrative remedies. We conclude, however, that the District Court acted well within the proper bounds of its discretion in making the award that it did under the circumstances present here.

16

IV

For the reasons set out above, we affirm the decision of the District Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit